Filed 8/12/13

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| ELK HILLS POWER, LLC, | ) | |
| | ) | |
| Plaintiff and Appellant, | ) | S194121 |
| | ) | |
| v. | ) | Ct.App. 4 D056943 |
| | ) | |
| BOARD OF EQUALIZATION et al., | ) | San Diego County |
| | ) | Super. Ct. No. 37-2008- |
| Defendants and Respondents. | ) | 00097074-CU-MC-CTL |
| _____ | ) | |

This case presents questions regarding how the State Board of Equalization (Board) may assess the value of an electric power plant for purposes of property taxation. The issue is complicated by the circumstance that, with exceptions not relevant here, assessors may not include the value of intangible assets and rights in the value of taxable property. (Cal. Const., art. XIII, § 2; Rev. & Tax. Code, §§ 110, 212; *Roehm v. County of Orange* (1948) 32 Cal.2d 280 (*Roehm*).) In this case, the power company purchased "emission reduction credits" (ERCs) — credits the company had to purchase to obtain authorization to construct the plant and to operate it at certain air-pollutant emission levels. All parties agree these ERCs constitute intangible rights for property taxation purposes. However, they dispute whether the Board improperly taxed the ERCs when it assessed the power plant. This dispute turns on our construction of Revenue and Taxation Code

section 110, subdivisions (d) and (e), and section 212, subdivision (c) (hereinafter sometimes sections 110(d), 110(e), and 212(c)).**1**

Sections 212(c) and 110(d) prohibit the direct taxation of certain intangible assets and rights, including the ERCs in this case. However, in assessing taxable property under section 110(e), the Board may "assum[e] the presence of intangible assets or rights necessary to put the taxable property to beneficial or productive use." The key issue is whether section 110, subdivisions (d) and (e) are mutually exclusive provisions, as the Court of Appeal held, or whether they can be applied together. We conclude that subdivisions (d) and (e) can be applied together. Resolution of this issue determines the validity of the Board's assessment of the power plant.

In this case, the Board used two methods of assessing the power plant, a replacement cost method and an income approach. With the replacement cost method, the Board estimated the cost of replacing the assets of the power plant. (Cal. Code Regs., tit. 18, § 6.) Because ERCs are necessary to put the power plant to beneficial use, the Board included the estimated cost of replacing the ERCs when it valued the plant. The issue is whether the Board may include the estimated cost of replacing the ERCs in using the replacement cost method. We conclude that the Board directly and improperly taxed the power company's ERCs when it added their replacement cost to the power plant's taxable value.

With the income approach, the Board estimated the amount of income the property is expected to yield over its life and determined the present value of that amount. (Cal. Code Regs., tit. 18, § 8.) The issue is whether the Board was required to attribute a portion of the plant's income stream to the ERCs and deduct

_____

**1** All further statutory references are to the Revenue and Taxation Code unless otherwise noted.

2

that value from the overall income estimate prior to taxation. We conclude that the Board was not required to deduct a value attributable to the ERCs under an income approach. There was no credible showing that there is a separate stream of income related to enterprise activity or even a separate stream of income at all that is attributable to the ERCs in this case.

## I. FACTS AND PROCEDURAL HISTORY

Elk Hills Power, LLC (Elk Hills), is a Delaware limited liability company that owns and operates an independent electric power plant in Kern County. Elk Hills brought this action under section 5148, subdivision (a), to recover property taxes paid to the County of Kern (County) during the five-year period from 2004 and 2008. Elk Hills alleged that the County improperly added an increment of value to Elk Hills's tax assessment that directly and impermissibly taxed its ERCs. Elk Hills had purchased these ERCs to gain authorization to construct the power plant and to operate it at specified emission levels.

In 1999, Elk Hills had applied for a permit to construct and operate a power plant in Tupman, California. Tupman is in the jurisdiction of the San Joaquin Valley Unified Air Pollution Control District (District), which ensures that proposed pollution sources comply with state air quality regulations. The California Clean Air Act of 1988 (Stats. 1988, ch. 1568, p. 5634) (California Clean Air Act) requires local air quality districts "to achieve and maintain the state and federal ambient air quality standards . . . and . . . enforce all applicable provisions of state and federal law." (Health & Saf. Code, § 40001, subd. (a).) In the San Joaquin Valley, the District's air quality rules forbid "net increases in emissions above specified thresholds from new and modified Stationary Sources

3

of all nonattainment pollutants." (Rules & Regs. of the San Joaquin Valley Unified Air Pollution Control Dist., rule 2201, § 1.2.)[2]

The District has also implemented an emission offset system to allow for the development of new pollution sources in compliance with local and federal mandates. (Health & Saf. Code, § 40709; Rule 2301.) Under the emission offset system, preexisting pollution sources that voluntarily reduce their emissions below the levels required by law are eligible to receive ERCs. Once ERCs are certified by the District, they can be sold to other emission sources for profit or banked for future use. (Health & Saf. Code, § 40709; Rule 2301.) The District requires new pollution sources to purchase ERCs to offset future emissions before it will issue an "authority to construct" document. (Pub. Resources Code, § 25523, subd. (d)(2); Rule 2201, § 4.5.) The use of surplus emission reductions, or credits, ensures the accommodation of economic growth without further increasing air emissions above the authorized levels of pollution (i.e., the "baseline" or "cap") for the air quality region. (See Health & Saf. Code, § 40709, subd. (b), added by Stats. 1979, ch. 1111, § 1, pp. 4044-4045; State Air Resources Bd., Enrolled Bill Rep. on Sen. Bill No. 847 (1979-1980 Reg. Sess.) Sept. 25, 1979, p. 2.)

Here, the District required Elk Hills to purchase five ERCs at an approximate cost of $11 million to offset the plant's projected emissions of nitrogen oxides, sulfur oxides, and volatile organic compounds. The purchased ERCs authorized Elk Hills to produce electricity at a continuous capacity of 500 megawatts of power. Elk Hills "surrendered" its ERCs to the District in 2003 and began producing electricity at specified levels.

---

[2] All further references to "Rules" refer to the Rules and Regulations of the San Joaquin Valley Unified Air Pollution Control District.

4

The Board used two different methods of unit valuation, the replacement cost approach and the income capitalization approach, to calculate the unitary value of the plant. Power plants are valued using a system called unit taxation. (*ITT World Communications, Inc. v. City and County of San Francisco* (1985) 37 Cal.3d 859, 863-864.) The purpose of unit taxation is to capture the entire real value of the property when all of its component parts are considered together (i.e., as a unit), as opposed to valuing the component parts in isolation or at scrap value. (*Id*. at p. 863.) "It has long been recognized that 'public utility property cannot be regarded as merely land, buildings, and other assets. Rather, its value depends on the interrelation and operation of the entire utility as a unit.' " (*Ibid*.) "Unit taxation prevents real but intangible value from escaping assessment and taxation by treating public utility property as a whole." (*Ibid*.)

For the taxable years from 2004 to 2008, the Board used the replacement cost approach to assess the unit value of the plant. Under the replacement cost approach, the tax assessor values the property "by applying current prices to the labor and material components of a substitute property capable of yielding the same services and amenities" and then applying a depreciation factor to arrive at a taxable base value. (Cal. Code Regs., tit. 18, § 6.) For all five years in question, the Board added a site-specific adjustment to account for the average replacement cost of the plant's ERCs. Elk Hills claimed that these annual additions directly and improperly assessed its ERCs.

For the taxable years from 2006 to 2008, the Board also used the income capitalization approach to assess the unit value of the plant.[3] Using the income

---

**3** In the taxable years from 2006 to 2008, the Board used both the replacement cost approach and the income approach to arrive at Elk Hills's taxable base value. Depending on the year, the replacement approach accounted for 70 to

*(footnote continued on next page)*

5

approach, an appraiser "estimates the future income stream a prospective purchaser could expect to receive from the enterprise and then discounts that amount to a present value by use of a capitalization rate." (*GTE Sprint Communications Corp. v. County of Alameda* (1994) 26 Cal.App.4th 992, 996 (*GTE Sprint*); see also Cal. Code Regs., tit. 18, § 8.) In other words, the fair market value of an income producing property is estimated as the present value of the property's expected future income stream. (See *Union Pacific R.R. Co. v. State Bd. of Equalization* (1989) 49 Cal.3d 138, 148.) " 'The income approach may be called the capitalization method because capitalizing is the process of converting an income stream into a capital sum.' " (*Ibid*.) Elk Hills claimed that the Board improperly taxed its ERCs because it failed to attribute a portion of the plant's income stream to the ERCs and deduct that value from the plant's projected income stream prior to taxation.

During the property tax refund litigation, the parties filed cross-motions for summary judgment. Finding no triable issues of fact, the trial court denied Elk Hills's motion for summary judgment and granted summary judgment for the Board and the County. The trial court found, in accordance with the parties' stipulation, that ERCs are intangible rights. It then determined that because ERCs are "intangible attributes of real property," they are subject to assessment under section 110, subdivision (f) (section 110(f)).

The Court of Appeal affirmed the trial court's rulings on a different ground. It held that section 110, subdivisions (d) and (e) are mutually exclusive provisions,

---

*(footnote continued from previous page)*

80 percent of the taxable base value and the income approach accounted for 20 to 30 percent of the taxable base value.

that ERCs are "necessary" to the productive use of the taxable property at issue, that section 110(d) is inapplicable where intangible assets or rights are "necessary," and that the Board properly "assum[ed] the presence" of ERCs under section 110(e).

We granted Elk Hills's petition for review to decide whether the Court of Appeal properly upheld the Board's valuation of Elk Hills's power plant.

## II. DISCUSSION

Elk Hills contends that the Court of Appeal's construction of section 110(d) and section 110(e) is incorrect and that its holding contravenes the constitutional and statutory property tax exemption for intangible rights or assets. (Cal. Const., art. XIII, § 2; §§ 212(c), 110(d).) On the other hand, the Board and the County argue that the Court of Appeal correctly upheld the Board's decision because the Board properly valued the plant at fair market value by "assuming the presence" of the ERCs. (Cal. Const., art. XIII, § 1; § 110(e).) Thus, we are presented with the question of how to properly value taxable property, with associated intangible assets, at fair market value.

### A. Standard of Review

"This case comes to us on review of a summary judgment. Defendants are entitled to summary judgment only if 'all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' [Citation.] To determine whether triable issues of fact do exist, we independently review the record that was before the trial court when it ruled on defendants' motion. [Citations.] In so doing, we view the evidence in the light most favorable to plaintiffs as the losing parties, resolving evidentiary doubts and ambiguities in their favor." (*Martinez v. Combs* (2010) 49 Cal.4th 35, 68.)

7

The proper scope of review of assessment decisions is well established. (*Bret Harte Inn, Inc. v. City and County of San Francisco* (1976) 16 Cal.3d 14, 21-23.) "When the assessor utilizes an approved valuation method, his factual findings and determinations of value based upon the appropriate assessment method are presumed to be correct and will be sustained if supported by substantial evidence." (*Service America Corp. v. County of San Diego* (1993) 15 Cal.App.4th 1232, 1235 (*Service America Corp.*).) However, where the taxpayer attacks the validity of the valuation method itself, the issue becomes a question of law subject to de novo review. (*Ibid.*; see also *GTE Sprint*, *supra*, 26 Cal.App.4th at p. 1001.) Because Elk Hills challenges the Board's methodology that includes the value of the ERCs in its unitary valuation of the power plant, the issue here is a question of law.

## B. Taxation Principles in General and Related to Intangible Rights

Article XIII, section 1 of the California Constitution requires generally the assessment of property at "fair market value." Similarly, article XIII, section 19 of the California Constitution requires tax assessors to tax power plants at fair market value. Fair market value means "the amount of cash or its equivalent that property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other, and both the buyer and the seller have knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used." (§ 110, subd. (a); see *De Luz Homes, Inc. v. County of San Diego* (1955) 45 Cal.2d 546, 562.) " ' "[T]he absence of an 'actual market' for a particular type of property does not mean that it has no value or that it may escape from the constitutional mandate that 'all property . . . shall be taxed in proportion to its value' (Art. XIII, § 1) but only that the assessor must then use such pertinent factors as replacement

8

costs and income analyses for determining 'valuation.' " [Citation.]' " (*County of Stanislaus v. County of Stanislaus Assessment Appeals Bd.* (1989) 213 Cal.App.3d 1445, 1456 (*County of Stanislaus*).)[4]  Thus, assessors have a constitutional mandate to tax all property at fair market value if not exempt under federal or state law.  (Cal. Const., art., XIII, § 1; § 201; *County of Stanislaus, supra*, 213 Cal.App.3d at p. 1451.)

Before 1933, intangible property was subject to taxation under California law.  (*Roehm, supra,* 32 Cal.2d at p. 288.)  In 1933, former section 14 of article XIII of the California Constitution (now art., XIII, § 2)[5] was amended to allow the Legislature to tax, or to exempt from taxation, certain forms of intangible property (e.g., notes, debentures, capital stock, and bonds).  In *Roehm*, we found that the effect of the 1933 amendments was to make all nonenumerated forms of intangible property exempt from property taxation.[6]  (*Roehm*, *supra*, 32 Cal.2d at p. 285.)

Sections 212(c) and 110 implement article XIII, sections 1 and 2 of the California Constitution.  Sections 212 and 110 are found in Revenue and Taxation Code division 1, which governs property taxation.  Specifically, section 212 is located in division 1, part 2.  Part 2 sets out which types of property are exempt from the basic rule that "[a]ll property in this State, not exempt under the laws of the United States or of this State, is subject to taxation."  (§ 201.)

---

[4]    Because there is generally an absence of an actual market for power plants, they are valued under the method of unit taxation.  (*ITT World Communications, Inc. v. City and County of San Francisco, supra*, 37 Cal.3d at p. 864, fn. 3.)

[5]    Article XIII, section 2 of the California Constitution has substantively similar language to article XIII, former section 14.

[6]    ERCs, the intangibles at issue here, are not enumerated in article XIII, section 2.

Section 212(c) broadly exempts intangible assets and rights from taxation. It provides, "Intangible assets and rights are exempt from taxation and, except as otherwise provided in the following sentence, the value of intangible assets and rights shall not enhance or be reflected in the value of taxable property. Taxable property may be assessed and valued by assuming the presence of intangible assets or rights necessary to put the taxable property to beneficial or productive use." (§ 212(c).)

Unlike section 212, section 110 is located in division 1, part 1, which sets out general provisions that govern the construction of division 1 as a whole. (See § 101 ["[T]he general provisions hereinafter set forth govern the construction of this division."].) Section 110 defines "full market value" and "full cash value," and provides rules of construction that harmonize section 212(c)'s tax exemption with the command that assessors tax all property at its fair market value.

Section 110(d) provides in relevant part: "Except as provided in subdivision (e), for purposes of determining the 'full cash value' or 'fair market value' of any taxable property, all of the following shall apply: [¶] (1) The value of intangible assets and rights relating to the going concern value of a business using taxable property shall not enhance or be reflected in the value of the taxable property. [¶] (2) If the principle of unit valuation is used to value properties that are operated as a unit and the unit includes intangible assets and rights, then the fair market value of the taxable property contained within the unit shall be determined by removing from the value of the unit the fair market value of the intangible assets and rights contained within the unit."

Thus, section 110(d)(1) and (2) prevents the direct taxation of intangible rights and assets when assessors use methods of unit valuation. Section 110(d)(1) prevents tax assessors from including the value of intangible assets that relate to the going concern value of a business within the unit value of property prior to

10

assessment. Section 110(d)(2) requires taxing authorities to value intangible assets and actively remove that value from a unit's taxable base value, so that the intangibles are not directly taxed. The procedures in section 110(d) operate in conjunction with section 110(e). (§ 110(d) ["Except as provided in subdivision (e) . . . all of the following shall apply."].)

Section 110(e) provides: "Taxable property may be assessed and valued by assuming the presence of intangible assets or rights necessary to put the taxable property to beneficial or productive use."

Here, ERCs fall within the class of intangibles described in section 110, subdivisions (d)(1) and (e). Section 110(d)(1) applies to intangible assets and rights "relating to the going concern value of a business." The going concern value of a business means "[t]he value of a commercial enterprise's assets or of the enterprise itself as an active business with future earning power, as opposed to the liquidation value of the business or of its assets." (Black's Law Dict. (abridged 8th ed. 2005), p. 1294 [defining "going-concern value"].) ERCs fall within the class of intangibles described in section 110(d)(1) because they are intangible assets that enable the day-to-day functioning of the power plant, and therefore necessarily relate to the going concern value of that business under either definition of going concern value.

Section 110(e) applies to intangible assets or rights that are "necessary" to the beneficial or productive use of taxable property. The parties stipulated that ERCs are intangible rights that enable Elk Hills to emit pollutants at levels that would otherwise exceed legally allowable emission rates. Thus, they agree that ERCs are necessary for the power plant to operate at its projected maximum production capacity. Furthermore, the District required Elk Hills to purchase ERCs to get the initial authority to construct the plant. Consequently, section

11

110(e) applies in this case.[7]  Moreover, because power plants are valued as a unit, section 110(d)(2) is also applicable.

The key question in this case is whether the application of section 110(e), in light of the opening language (preamble) of section 110(d), renders section 110(d)

[7]    Amicus curiae South Coast Air Quality Management District (SCAQMD) claims that although ERCs may confer intangible rights, they are not intangible property.  SCAQMD asserts that this distinction is important because air quality control districts like SCAQMD can reduce or extinguish the value of ERCs, or place a moratorium on their use, to meet federally mandated emissions levels.  (See Rule 2301, §§ 6.7, 6.10.)  If ERCs were property, then those actions might be subject to the takings clause.  SCAQMD's position is supported by statutory and case law.

Property interests are defined by independent sources of law; they are not defined by the inherent property-like characteristics of the alleged property.  (*Board of Regents v. Roth* (1972) 408 U.S. 564, 577 ["Property interests . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law — rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."].)  Furthermore, not all intangible rights are intangible property rights.  For example, the high court has held that a state's intangible rights to issue, renew, and revoke video poker licenses were not property rights.  (*Cleveland v. United States* (2000) 531 U.S. 12, 23 ["[F]ar from composing an interest that has 'long been recognized as property,' [citation], these intangible rights of allocation, exclusion, and control amount to no more and no less than Louisiana's sovereign power to regulate."].)  Here, the California Clean Air Act mandates that ERCs "shall not constitute instruments, securities, or any other form of property."  (Health & Saf. Code, § 40710.)  Moreover, the District's Rules allow it to adjust the quantity of banked ERCs without the owner's consent  (Rule 2301, § 6.7), and to declare a full or partial moratorium on the use of banked ERCs (Rule 2301, § 6.10).  Thus, California law indicates that ERCs are not intangible property.

However, the fact that ERCs do not constitute property does not resolve this case.  Even if ERCs are not property, an assessor may properly consider their presence when valuing the plant.  Assessors often consider nonproperty when valuing taxable property.  For example, an excellent public school is not the property of a homeowner, but proximity to that school increases the value of the home. The issue here is whether the assessor crossed the line from appropriate consideration of Elk Hills's ERCs into direct taxation.

inoperable. The preamble states: "Except as provided in subdivision (e) . . . all of the following shall apply." (§ 110(d).) Relying on this language, the Board and the County argue that subdivisions (d) and (e) are mutually exclusive provisions and cannot both be implemented, and that because subdivision (e) clearly applies, subdivision (d) cannot apply in this case. Elk Hills responds that subdivisions (d) and (e) must be harmonized and applied together or intangible assets will be directly taxed in violation of section 212(c). The Court of Appeal concluded that subdivisions (d) and (e) are mutually exclusive provisions and thus upheld the Board's assessment under both the replacement cost and income stream approach.

Settled principles of statutory construction mandate that " '[t]he statute's plain meaning controls the court's interpretation unless its words are ambiguous.' [Citations.] 'If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' [Citation.]" (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 527.) Moreover, "[every] statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect." (*Stafford v. Los Angeles County Employees' Retirement Bd.* (1954) 42 Cal.2d 795, 799.)

The language of section 110(d)'s preamble, "Except as provided in subdivision (e) . . . all of the following shall apply," permits more than one reasonable interpretation. On its face, this language might mean that subdivision (e) applies to the complete exclusion of subdivision (d), but it might also mean that the principles in subdivision (d) should be construed so that they do not conflict with subdivision (e). Because section 110 is ambiguous as to the applicability of subdivision (d) when subdivision (e) applies, we turn to the statute's structure, purpose, and legislative history. These extrinsic sources, combined with the case law that directly preceded the enactment of sections

13

212(c) and 110, subdivisions (d) and (e), show that subdivisions (d) and (e) contain nonconflicting principles that must be applied together.

### C. Legislative History of Sections 110(d) and (e) and 212(c)

In October 1995, Governor Pete Wilson signed the Omnibus Property Tax Reform Act of 1995 into law. The act clarified the property tax treatment of intangibles by adding subdivisions (d) and (e) to section 110, and subdivision (c) to section 212. (Stats. 1995, ch. 498, §§ 5-6, pp. 3831-3832.)

The legislative history supports the conclusion that section 110, subdivisions (d) and (e) apply together. A Senate report analyzing the enacting bill stated that "since most of the property tax is based in the Constitution, most of what we know about the property tax comes from the courts. If courts agree that these changes are merely clarifying, then they make no change to the law." (Sen. Revenue & Taxation Com., Analysis of Sen. Bill No. 657 (1995-1996 Reg. Sess.) as amended Apr. 6, 1995, p. 3.) The legislative analysis expressly referred to five published appellate decisions that all relied on our seminal case, *Roehm*, *supra*, 32 Cal.2d 280, and its progeny. (Sen. Revenue & Taxation Com., Analysis of Sen. Bill No. 657 (1995-1996 Reg. Sess.) as amended June 29, 1995, p. h.) Relying on *Roehm*, these cases applied the principles that would later be embodied in section 110, subdivisions (d) and (e), in harmony. (*GTE Sprint, supra*, 26 Cal.App.4th at pp. 1004, 1007; *Service America Corp., supra*, 15 Cal.App.4th at pp. 1240-1242; *Shubat v. Sutter County Assessment Appeals Bd. No. 1* (1993) 13 Cal.App.4th 794, 804 (*Shubat*); *County of Orange v. Orange County Assessment Appeals Bd. No. 1* (1993) 13 Cal.App.4th 524, 532-534 (*County of Orange*); *County of Los Angeles v. County of Los Angeles Assessment Appeals Bd. No. 1* (1993) 13 Cal.App.4th 102, 111-113 (*County of Los Angeles*).) In fact, the principles contained in subdivisions (d) and (e) originated in *Roehm*.

In *Roehm*, we addressed a challenge to a county's decision to assess a taxpayer's on-sale general liquor license. We held that the county improperly levied a $432.62 tax on the license because the liquor license was of intangible value, which was "not subject to ad valorem taxation as personal property." (*Roehm*, *supra*, 32 Cal.2d at p. 290.) First, we noted that article XIII, former section 14 (now§ 2) of the California Constitution authorized the Legislature to provide for the taxation of certain forms of intangible property only, specifically that enumerated in the constitutional provision. (*Roehm*, at p. 285.) We then noted that the Legislature had affirmatively exempted all but one of the constitutionally taxable intangibles (solvent credits) from direct taxation when it passed former section 111.[8] (*Roehm*, at p. 285.) Finally, we counseled that our interpretation was supported by the need for an administrable state tax system. (*Id*. at pp. 287, 290.) As the variety of intangible assets expanded in the 1930s and 1940s, the extent to which those assets "were either evading taxation or, when found, were being subjected to inordinate and unjust burdens had grown to be a real evil in the structure and operation of our state laws" on local taxation. (*Id.* at p. 288.) Thus, we concluded that the county's ad valorem taxation of Roehm's intangible asset was statutorily and constitutionally impermissible, and contrary to sound public policy.[9] (*Roehm*, at pp. 285, 290.) The main principle supporting

---

[8]    The Legislature repealed section 111 in 1967. (Stats. 1967, ch. 1632, p. 3905, § 1.) The current statutory exemptions for intangibles are contained in sections 110(d) and 212(c).

[9]    We noted that the 1933 amendments included the implementation of a state income tax, which would tax the net income derived from ownership of property, and we reasoned the income tax was a "sufficient burden on the benefits derived from the ownership of such [intangible] rights and privileges." (*Roehm*, *supra*, 32 Cal.2d at p. 289.) Thus, intangible rights and assets do not escape taxation completely.

the *Roehm* decision is now reflected in section 110(d)(1): "The value of intangible assets and rights relating to the going concern value of a business using taxable property shall not enhance or be reflected in the value of the taxable property."

However, we also stated: "Intangible values . . . that cannot be separately taxed as property may be reflected in the valuation of taxable property. Thus, in determining the value of property, assessing authorities may take into consideration earnings derived therefrom, which may depend upon the possession of intangible rights and privileges that are not themselves regarded as a separate class of taxable property." (*Roehm*, *supra*, 32 Cal.2d at p. 285.) This principle is reflected in section 110(e). *Roehm* provides no indication that this second principle in any way supersedes the prohibition on taxing intangible assets. Indeed, by holding that the assessment improperly included the value of the liquor license, *Roehm* suggests that to the extent this second principle applies to the assessment of properly taxable property, the value of related intangible assets simply has not been taxed.

Fourteen years later, we reaffirmed the principles set forth in *Roehm* in *Michael Todd Co. v. County of Los Angeles* (1962) 57 Cal.2d 684 (*Michael Todd*). In *Michael Todd*, a taxpayer corporation argued that the property tax assessment of motion picture film negatives could not be enhanced by the presence of the motion picture's copyright and that consequently the film could only be valued at "scrap" or "salvage value." (*Id.* at p. 696.) In rejecting the taxpayer's position, we explained that " 'market value' for assessment purposes is the value of property when put to beneficial or productive use; it is not merely whatever residual value may remain after the property is demolished, melted down, or otherwise reduced to its constituent elements." (*Ibid.*) Because "[t]he sole beneficial or productive use of the negative film of a motion picture is for making prints thereof for exhibition, whether such prints be sold or leased," the assessor was permitted to

16

value the film negatives at its beneficial and productive use. (*Ibid*.) Thus, the assessor could properly assume the existence of a motion picture copyright to determine the fair market value of the film's negatives, without assessing the copyright itself. (*Id.* at pp. 691, 696.)

*Roehm* and *Michael Todd* show that although intangible rights and assets are not directly taxable, much of the value of taxable assets can be intangible in nature. For example, "[a] vacant lot has value not as a vacant lot but by virtue of its [intangible right] to hold a structure or to serve another purpose." (Sen. Revenue & Taxation Com., Analysis of Sen. Bill No. 657, *supra*, as amended Apr. 6, 1995, p. 3.) *Roehm* provided a sensible caveat to the prohibition against taxing intangibles: where the beneficial or productive use of tangible property "depend[s] upon the possession of intangible rights and privileges that are not themselves regarded as a separate class of taxable property," an assessor must assume the presence of those intangible rights. (*Roehm*, *supra*, 32 Cal.2d at p. 285.) If assessors could not assume the presence of intangible assets, then much of the fair market value of taxable property would escape taxation, in violation of the California Constitution. (*Michael Todd, supra*, 57 Cal.2d at p. 696.)

After *Roehm*, courts recognized that even if intangible assets are necessary to the beneficial or productive use of taxable property, the inquiry did not end simply with a finding that section 110(e) applied, as the Court of Appeal held here. Instead, courts proceeded to determine whether the value of the intangible assets was improperly subsumed in the taxation. If so, those courts instructed assessors to go back and attribute a portion of the income stream to account for the value of the intangible asset, and remove that value. (See *GTE Sprint, supra*, 26 Cal.App.4th at pp. 1004, 1007 [board must exclude value of enterprise-related intangible assets when assessing tangible property; it cannot assume unit valuation, which, when calculated by income method, "only [assesses] the

17

intangible values as they enhance the tangible property"]; *Service America Corp.,* *supra*, 15 Cal.App.4th at pp. 1240-1242 [assessor erred in using entire income flow earned by franchisee ballpark concession company; large part of income earned based on enterprise value as distinguished from value of use of property]; *Shubat, supra*, 13 Cal.App.4th at p. 804 [assessor erred in failing to exclude value of cable television company's intangible assets (e.g., right to conduct business, subscriber list, going concern)]; *County of Orange, supra*, 13 Cal.App.4th at pp. 532-534 [assessor's valuation of cable television system failed to exclude value of company's intangibles that enhanced value of business (e.g., existing franchises, licenses to construct, goodwill)]; *County of Los Angeles*, *supra*, 13 Cal.App.4th at pp. 111-113 [assessment of airport car rental concession based on capitalized fees (measured as percentage of income from airport area operations) improperly included value of "right to do business" intangibles].)

As noted, the Legislature codified *Roehm* and its progeny by adding subdivision (c) to section 212, and subdivisions (d) and (e) to section 110. Because section 110(d) and (e), and section 212(c), were added at the same time for the same purpose, they should be read consistently. Section 212(c) contains three clauses, and their interrelation sheds light on the proper reading of the preamble to section 110(d). While the second and third clauses track principles contained in section 110, subdivisions (d) and (e), the first clause provides a blanket tax exemption for intangible assets: "Intangible assets and rights are exempt from taxation . . . ." (§ 212(c).) This broad prohibition is only contained in section 212 and not section 110, because section 212 falls within the part of the Revenue and Taxation Code describing property tax exemptions. On the other hand, section 110 falls within the part of the code that provides rules that govern the construction of property taxation as a whole.

18

Section 212(c)'s second clause tracks the language of the preamble to 110(d) as well as the contents of section 110(d)(1). However, it is different in a respect that is key to unlocking the relationship between section 110, subdivisions (d) and (e). "[E]xcept as *otherwise* provided in the following sentence, the value of intangible assets and rights shall not enhance or be reflected in the value of taxable property. (§ 212(c), italics added.) "[T]he following sentence" refers to section 212(c)'s third clause, which tracks the language of section 110(e): "Taxable property may be assessed and valued by assuming the presence of intangible assets or rights necessary to put the taxable property to beneficial or productive use." (§ 212(c).)

Looking to the second clause, the phrase "except as *otherwise* provided in the following sentence" governs the relationship between the principles contained in clauses two and three. (§ 212(c), italics added.) This language does not indicate that when clause three applies, clause two does not. It simply means that assessors cannot tax *the value* of intangible assets directly (clause two), but that principle does not prevent assessors from assuming the presence of intangible assets when valuing *taxable property* (clause three). In other words, assessors must do their constitutional duty to assess taxable property at fair market value (clause three) while making sure that the value of intangible assets is not improperly subsumed within the value of taxable property (clause two). Thus, section 212(c)'s statutory structure is consistent with *Roehm*, which also forbids the direct taxation of intangibles, but allows the value of taxable property to be enhanced from scrap value to fair market value when assessors assume the presence of necessary intangibles. (*Roehm*, *supra*, 32 Cal.2d at p. 285.)

With this reading of section 212(c) in mind, the meaning of section 110(d)'s preamble becomes apparent. "Except as provided in subdivision (e)," cannot mean that when section 110 subdivision (e) applies, subdivision (d) does

19

not because that reading would be inconsistent with our interpretation of section 212. Rather, it means that section 110(d) cannot negate a tax assessor's constitutional duty to value taxable property at fair market value in accordance with the principle laid out in section 110(e).

From the above legislative history and statutory language, several points emerge. First, *Roehm* and section 212(c) make clear that even if an intangible asset fits within the scope of section 110(e), that is, its presence is "necessary to put the taxable property to beneficial or productive use" (§ 212(c)), that asset still may not be directly taxed. Second, although subdivision (d) is limited by the phrase "[e]xcept as provided in subdivision (e)," section 110, subdivisions (d)(1) and (e) are mutually exclusive only in this limited sense: if the assessor assumes the presence of an intangible asset necessary to put taxable property to beneficial use within the meaning of subdivision (e), and does no more than this, then by definition the assessor has not violated subdivision (d)(1)'s prohibition on the value of intangible assets "relating to the going concern value of a business" enhancing the value *of the taxable property*. But there is no reason why an intangible asset cannot enhance both taxable property and the going concern value of the business on which the property resides. The case law recognizes that assessors, if they are valuing taxable property according to the income produced, may have to apportion income between enterprise activity and the property itself. (See *County of Stanislaus*, *supra*, 213 Cal.App.3d at p. 1455.)

Third, section 110(d)(2) is a stopgap provision that requires assessors to remove intangible assets that are improperly included in the unitary value of property prior to assessment. (See, e.g., *GTE Sprint*, *supra*, 26 Cal.App.4th at p. 995.) Thus, even when an intangible asset enhances the value of taxable property pursuant to section 110(e), to the extent that the unitary valuation reflects a direct

20

valuation of the asset itself, or includes income appropriately attributed to enterprise value, section 110(d)(2) requires the removal of such values.

Finally, since the post-*Roehm* cases all apply the *concepts* embodied in section 110, subdivisions (d)(1), (2) and (e) together, the statute should be interpreted the same way. (See cases cited, *ante*, at pp. 17-18.) Thus, the operative principles in section subdivisions (d) and (e) do not conflict. Section 110(d)(1) prevents *the value* of intangible assets from enhancing or being reflected in the valuation of taxable property. Section 110(e) allows assessors to enhance the valuation of taxable property, not by including *the value* of intangible assets in the valuation (see 110(d)(1)), but simply by *assuming the presence* of intangible assets when valuing the taxable property put to beneficial or productive use. While the value of the taxable property is enhanced, it is not enhanced by *the value* of intangible assets. That would violate section 110(d)(1) as well as section 212(c). Rather, it is enhanced by *the presence* of intangible assets.

On a motion for summary judgment, the court must acknowledge that 212(c) exempts intangible assets and rights from taxation. If the plaintiff taxpayer presents evidence that the value of intangible assets contributed in some way to the unit valuation of its taxable property, the court must first determine if those intangible assets were necessary to the beneficial or productive use of the property, because if they are not, then they could not have been taken into account in the valuation. (§ 110, subds. (d), (e).)

Second, if the intangible assets are necessary to the beneficial or productive use of the taxable property, the court must determine whether the plaintiff has put forth credible evidence that the fair market value of those assets has been improperly subsumed in the valuation. If so, then the valuation violates section 110(d)(1), which prohibits an assessor from using the value of intangible rights

21

and assets to enhance the value of taxable property, and the fair market value of those assets must be removed pursuant to section 110(d)(2).

Accordingly, legislative history, case law, and the structure of the applicable tax code provisions demonstrate that the Court of Appeal erred in concluding that section 110(e) operates to the complete exclusion of section 110(d). Since 110(d)(2) has mandatory provisions that apply to unit valuation cases, it was an error not to apply that provision here. Therefore, it is necessary to address what effect section 110(d)(2) has on the Board's assessment under both its replacement cost and income stream valuations.

### D. The Board Improperly Assessed Elk Hills's ERCs Under the Replacement Cost Approach

The Board used the replacement cost approach to approximate the fair market value of the power plant at the total cost of obtaining "a substitute property capable of yielding the same services and amenities." (Cal. Code Regs., tit. 18, § 6.) For each of the taxable years from 2004 to 2008, the Board added a site-specific adjustment to the replacement cost of the plant to account for the replacement cost of ERCs. Under section 110(d)(2) and section 212(c), the Board improperly taxed Elk Hills's ERCs under the replacement cost approach.

Section 110(d)(2) requires assessors to remove the *fair market value* of intangible assets from the fair market value of the taxable unit prior to assessment so that the intangibles are not directly taxed. In a replacement cost assessment, the fair market value of the ERCs is the replacement cost of the ERCs. Here, the Board included the value of the ERCs in the base value of the unit when it added their replacement cost to the replacement cost of the plant.

The Board argues that its site-specific adjustment for ERCs and other "soft costs" is not direct taxation, but rather an appropriate assessment of the plant, assuming the presence of the intangibles that are necessary to its productive use.

22

However, there is a meaningful difference between assuming the presence of an intangible asset and adding value to the unit whole to account for the presence of that intangible asset. (See, e.g.*, Shubat*, *supra*, 13 Cal.App.4th at p. 804 ["While we agree intangible values *may be reflected* in the value of a possessory interest, it does not follow such values are subsumed as a matter of law."].)

Further, the Board's own assessment manual states: "Sections 110(e) and 212(c) do not authorize *adding an increment* to the value of taxable property to reflect *the value* of intangible assets." (Bd. of Equalization, Assessor's Handbook, Section 502; Advanced Appraisal (Dec. 1998), ch. 6, p. 152 (Assessor's Handbook), italics added.) Thus, assuming the presence of intangibles is permitted. (See, e.g., *Los Angeles SMSA Limited Partnership v. State Bd. of Equalization* (1992) 11 Cal.App.4th 768, 774-778 (Los Angeles SMSA) [valuation of cellular telephone company taxable property operating at its highest and best use assumes presence of FCC license].)[10] However, including the fair market value of an intangible asset within the unit whole amounts to the direct taxation of those assets. (See, e.g., *County of Los Angeles*, *supra*, 13 Cal.App.4th at pp. 111-113.)

The Board also attempts to distinguish ERCs as different in kind from the intangibles that required a deduction in other cases. (See case cited, *ante*, at pp. 17-18.) However, this argument is unavailing in the context of the Board's direct taxation of an intangible asset under the replacement cost approach. Intangible

---

[10] The "beneficial or productive use" of the property as used in sections 110(e) and 212(c) has been equated with the "highest and best use" of the property. (*Watson Cogeneration Co. v. County of Los Angeles* (2002) 98 Cal.App.4th 1066, 1070-1071.) Whether one assesses property at its "highest and best" use or at its "beneficial or productive use," its valuation is still subject to the deductions for the value of intangibles from the unitary value of the property under sections 110(d) and 212(c).

rights are exempt from direct taxation whether or not they are necessary and whether or not they enhance the going concern value of a business. (See § 212(c).) Although the Board was permitted to assume the presence of the ERCs in valuing Elk Hills's taxable property as an operating power plant (§ 110(e)), it impermissibly added the fair market value of the ERCs to the unit whole as part of its replacement cost valuation, and then failed to deduct that value prior to assessment. (§ 110(d)(1), (2)).[11]  In failing to deduct the fair market value of the ERCs, the Board directly taxed Elk Hills's intangible right in violation of section 212(c). Accordingly, the Court of Appeal erred in upholding the Board's valuation of Elk Hills's plant under the replacement cost approach.

### E.  The Board Properly Assumed the Presence of the ERCs Under the Income Capitalization Approach

Elk Hills argues that when the Board calculated the plant's unitary value, it failed to attribute a portion of the plant's income to its ERCs and deduct that amount from the plant's projected income stream. In other words, Elk Hills claims that the Board failed to apply section 110(d)(2) to its income stream analysis. Section 110(d)(2) requires the assessor to "remov[e] from the value of the unit the fair market value of the intangible assets and rights contained within the unit." However, under an income stream approach, not all intangible rights have a quantifiable fair market value that must be deducted. There are two lines of

---

**11**     Where the taxpayer does not proffer evidence that the Board included the fair market value of an intangible right or asset in the unit whole, the Board would not have to make a deduction prior to assessment. (§ 110(d)(2).) For example, if the Board does not add the value of ERCs to its *replacement cost valuation*, it obviously would not have to deduct their value prior to assessment, because that would produce an unwarranted windfall for the taxpayer.

income capitalization cases that illustrate when a section 110(d)(2) deduction is and is not required.

In the first line of cases, as in this case, courts have upheld income-based assessments that properly assumed the presence of intangibles assets necessary to the productive use of taxable property without deducting a value for intangible assets. (See, e.g., *Michael Todd*, *supra*, 57 Cal.2d at p. 696; *Los Angeles SMSA*, *supra*, 11 Cal.App.4th at pp. 774-778; *American Sheds, Inc. v. County of Los Angeles* (1998) 66 Cal.App.4th 384, 388.) For example, in *American Sheds*, the county assessment appeals board taxed a landfill under the income approach. (*American Sheds, supra*, 66 Cal.App.4th at p. 388.) For the taxable years between 1987 and 1990, the landfill's use permit authorized operation at full capacity. In 1991, the government restricted the landfill's use to about 10 percent of its previous capacity. Accordingly, the 1991 tax assessment of the property was about 90 percent lower than previous assessments. (*Ibid*.) American Sheds argued that the difference between the assessment of the landfill when it operated at 100 percent capacity as opposed to 10 percent capacity "confirms that the board included the permits as a principal component of the property and its value." (*Id.* at p. 395.) The court disagreed. It held that the board's assessment was "consistent with treating the intangibles as nontaxable, while recognizing the impact of their presence or absence on the beneficial use of the property, and consequently the amount of income it could yield." (*Id.* at p. 395.) Plaintiff's evidence did "not establish that the [assessment appeals] board improperly utilized or included for valuation the intangibles of the permits and related business enterprise." (*Ibid*.; see also *Los Angeles SMSA*, *supra*, 11 Cal.App.4th at p. 778 [board permissibly calculated cellular telephone company's income stream without a deduction for the value of its FCC license; FCC license merely enabled the telephone company to enhance the value of its tangible property].)

25

The second line of cases disapproved assessments that failed to attribute a portion of a business's income stream to the enterprise activity that was directly attributable to the value of intangible assets and deduct that value prior to assessment. (See cases cited, *ante,* at pp. 17-18.) These cases illustrate the principle that although assessors may assume the presence of intangibles when considering the income stream derived from taxable property that is put to beneficial or productive use (§ 110(e)), the value of intangibles that directly enhance that income stream cannot be subsumed in the valuation of taxable property (§ 110(d)(1)), and must be deducted from the unit prior to assessment (§ 110(d)(2)). The difference is one of degree; intangible rights like ERCs merely allow for the taxable property to generate income when put to its beneficial or productive use. Thus, their contribution to the income stream is indirect, whereas intangible assets like the goodwill of a business, customer base, and favorable franchise terms or operating contracts all make a direct contribution to the going concern value of the business as reflected in an income stream analysis. Only the latter category of intangible assets and rights has a quantifiable fair market value that must be deducted from an income stream analysis prior to taxation.

Here, Elk Hills's ERCs fit within the first line of cases and do not warrant a deduction of their fair market value from the fair market value of the unitary property. (§ 110(d)(2)). Under the income stream approach, the fair market value of property is based on the projected amount of income that property will earn over its lifetime. (Cal. Code Regs., tit. 18, § 8.) When using this approach, " '[i]ncome derived in large part from *enterprise* activity [may not] be ascribed to the property being appraised; instead it is the earnings from the [taxable] property itself or from the beneficial use thereof which are to be considered.' " (*County of Stanislaus*, *supra*, 213 Cal.App.3d at p. 1455; see also § 110(e).)

26

In this case, it is undisputed that the surrendered ERCs fall within the scope of section 110(e), inasmuch as they are "necessary to put the taxable property to beneficial or productive use." Elk Hills purports to have produced evidence showing that the ERCs had independent value that had to be deducted from total income generated by the power plant, using the Board's own method of unitary valuation. But the portion of the Board's manual on unitary valuation placed in the record pertains to income from intangibles related to enterprise activity, such as "customer base" and "patents and copyrights," which may not be ascribed to taxable property. (*County of Stanislaus*, *supra*, 213 Cal.App.3d at p. 1455; see also *GTE Sprint*, *supra*, 26 Cal.App.4th at p. 998 [intangible assets that the plaintiff requested to be removed included "customer base; assembled workforce; favorable broadband leases of transmission capacity from other carriers; favorable property leases; advertising agency relationships; favorable debt financing contracts; inventory of advertising materials" and goodwill].)

Here, by contrast, the sole purpose of the surrendered ERCs is to enable the taxable property in question to function and produce income as a power plant, thereby enhancing the value of that property. There is no indication that the Board, when it employed the income capitalization approach, valued ERCs in any manner other than by "assuming their presence" in order to tax the property in question as a fully functioning power plant. (See *GTE Sprint*, supra, 26 Cal.App.4th at p. 1007 [the principle that the value of certain types of intangible assets must be excluded when assessing taxable property does not "abrogate the rule that intangible values may be treated as enhancing the value of the tangible property"].) Elk Hills has not articulated a basis for attributing to the surrendered ERCs a separate stream of income related to enterprise activity, or indeed any separate stream of income at all. As such, we have no basis for concluding the

27

Board erred in not imputing to the ERCs some independent value that would be deducted from the total income generated by the taxable property.

### F. The Trial Court Erred in Upholding the Board's Assessment Under Section 110(f)

Although the Court of Appeal declined to base its decision upon section 110(f), the Board argues that it provides an alternative basis for the Court of Appeal's decision upholding the Board's replacement cost valuation. The Legislature added section 110(f) as part of the same 1995 legislation adding section 110, subdivisions (d) and (e), and section 212(c). (Stats. 1995, ch. 498, §§ 5-6, pp. 3831-3832.)

Section 110(f) states: "For purposes of determining the 'full cash value' or 'fair market value' of real property, intangible *attributes of real property* shall be reflected in the value of the real property. These intangible attributes of real property include zoning, location, and other attributes that relate directly to the real property involved." (Italics added.)

The trial court upheld the Board's assessment on the ground that ERCs are attributes of real property that are properly assessed under section 110(f). The trial court based its decision on *Mitsui Fudosan, Inc. v. County of L.A.* (1990) 219 Cal.App.3d 525 (*Mitsui*).) In *Mitsui*, the Court of Appeal held that transferable development rights (TDRs) that a property developer acquired to build additional floors on a high-rise were part of the bundle of rights associated with the real property. (*Id*. at pp. 528-529.) The legal instrument governing Mitsui's TDRs indicated that the TDRs " 'shall be appurtenant to and used for the benefit of the real property owned by [Mitsui]' and that they 'shall run with the land and shall be binding upon Seller, as owner of Seller's Parcel and upon any future owners.' " (*Id*. at pp. 528-529.)

28

*Mitsui* is distinguishable because ERCs are different from TDRs. ERCs do not run with the land; they may be severable, they can be bought and sold, and they have value apart from the real property. (See Health & Saf. Code, § 40709 et seq.) Section 110(f) contemplates intangibles that are attributes of real property, like proximity to an ocean view or to a sewage treatment plant. (Assessor's Handbook, *supra*, p. 155.) "[M]any intangible attributes of real property can be subsumed in the single concept of 'location.' Location is a broad concept encompassing both physical attributes . . . and intangible attributes. Zoning is generally determined by a property's location within a community and in relation to neighboring properties." (*Ibid*.) These kinds of intangible attributes "are an integral part of and effectively define [the property]." (*Shubat*, *supra*, 13 Cal.App.4th at p. 803.) On the other hand, "[i]ntangible attributes of real property do not include licenses, franchises, and other rights to do business that are exercised in connection with the use of the real property." (Assessor's Handbook, *supra*, p. 155, fn. 11.) Thus, there is a fundamental difference between location, zoning, view, or architecture, and intangibles, such as ERCs, that "relate to the real property only in their connection with the business using it." (*Shubat*, *supra*, 13 Cal.App.4th at p. 803.)

Even were section 110(f) to apply, it should be read in harmony with section 212(c). The Board's assessment under the replacement cost approach is inconsistent with section 212(c), which exempts intangible rights, like ERCs, from taxation. When the Board added a site-specific adjustment to its annual replacement cost valuation, that increment of value directly taxed Elk Hills's ERCs. Accordingly, the Board had to remove its site-specific adjustment for ERCs from the base value of the plant prior to assessment whether or not section 110(f) applied. Thus, the trial court erred when it held that the Board's replacement cost assessment was appropriate under section 110(f).

29

**CONCLUSION**

The Court of Appeal erred in affirming the trial court's grant of the Board and the County's summary judgment motion. Accordingly, we reverse its judgment and remand to that court for further proceedings consistent with this opinion.

CHIN, J.

WE CONCUR:

CANTIL-SAKAUYE, C.J.
KENNARD, J.
CORRIGAN, J.
LIU, J.
MIHARA, J.*
MILLER, J.**

_____
* Associate Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**Associate Justice of the Court of Appeal, Fourth Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Elk Hills Power, LLC v. Board of Equalization
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 195 Cal.App.4th 285
**Rehearing Granted**

_____

**Opinion No.** S194121
**Date Filed:** August 12, 2013
_____

**Court:** Superior
**County:** San Diego
**Judge:** Ronald L. Styn

_____

**Counsel:**

Law Offices of Peter Michaels, Peter W. Michaels; Gibson, Dunn & Crutcher, Julian W. Poon, Blaine H. Evanson; Mooney, Wright & Moore and Paul J. Mooney for Plaintiff and Appellant.

Richard N. Wiley for Wirelessco, L.P., as Amicus Curiae on behalf of Plaintiff and Appellant.

Reed Smith, Mardiros H. Dakessian, Margaret M. Grignon, Mike Shaikh and John R. Messenger for Institute for Professionals in Taxation as Amicus Curiae on behalf of Plaintiff and Appellant.

Sutherland, Asbill & Brennan, Douglas Mo, Prentiss Willson, Jr., and Eric S. Tresh for Broadband Tax Institute as Amicus Curiae on behalf of Plaintiff and Appellant.

Wm. Gregory Turner for Council on Taxation as Amicus Curiae on behalf of Plaintiff and Appellant.

Cahill, Davis & O'Neall and Cris K. O'Neall for California Taxpayers Association, California Manufacturers & Technology Association and Silicon Valley Leadership Group as Amici Curiae on behalf of Plaintiff and Appellant.

Coblentz, Patch, Duffy & Bass, Richard R. Patch, Jeffrey Sinsheimer and Charmaine G. Yu for California Cable and Telecommunications Association as Amici Curiae on behalf of Plaintiff and Appellant.

Paul Hastings, Peter H. Weiner, Gordon E. Hart, Sean D. Unger, Jill E. C. Yung, Nancy Iredale and Jeffrey G. Varga for Independent Energy Producers Association as Amici Curiae on behalf of Plaintiff and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, David S. Chaney, Chief Assistant Attorney General, Paul D. Gifford, Assistant Attorney General, Felix E. Leatherwood, Dean Freeman, Leslie Branman Smith, Brian Wesley and Tim Nader, Deputy Attorneys General, for Defendant and Respondent Board of Equalization.

**Counsel:**

Theresa A. Goldner, County Counsel, and Jerri S. Bradley, Deputy County Counsel, for Defendant and Respondent County of Kern.

John F. Kratli, Acting County Counsel (Los Angeles) and Albert Ramseyer, Principal Deputy County Counsel, for John R. Noguez, Los Angeles County Assessor as Amicus Curiae on behalf of Defendants and Respondents.

Edward G. Summers for Middle Class Taxpayers as Amicus Curiae on behalf of Defendants and Respondents.

Michael Wall and Alex Jackson for Natural Resources Defense Council as Amicus Curiae on behalf of Defendants and Respondents.

Miguel Márguez, County Counsel (Santa Clara), Orry P. Korb, Assistant County Counsel, Robert M. Coelho, Lead Deputy County Counsel, and Steve Mitra, Deputy County Counsel, for California State Association of Counties and California Assessors' Association as Amicus Curiae on behalf of Defendants and Respondents.

John Stump for Sierra Club as Amicus Curiae on behalf of Defendants and Respondents.

Ann Hancock for Climate Protection Campaign as Amicus Curiae on behalf of Defendants and Respondents.

Kurt R. Wise and Barbara Baird for South Coast Air Quality Management District as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Paul J. Mooney
Mooney, Wright & Moore
1201 South Alma School Road, Suite 16000
Mesa, AZ  85210
(480) 615-7500

Tim Nader
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2210