Filed 9/18/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| EHP GLENDALE, LLC, et al., | B244494 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC 385925) |
| v. | |
| COUNTY OF LOS ANGELES, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michelle R. Rosenblatt, Judge.  Affirmed.

Cahill Davis & O'Neall, John D. Cahill, Cris K. O'Neall, C. Stephen Davis and Andrew W. Bodeau for Plaintiffs and Appellants.

Sutherland Asbill & Brennan and Douglas Mo for American Seniors Housing Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

John F. Krattli, County Counsel, and Albert Ramseyer, Deputy County Counsel, for Defendant and Respondent.

Kamala D. Harris, Attorney General, Paul D. Gifford, Assistant Attorney General, Felix E. Leatherwood, W. Dean Freeman and Marta L. Smith, Deputy Attorneys General, for the California State Board of Equalization as Amicus Curiae.

For a second time, we are asked to review an action for a property tax refund filed by appellants EHP Glendale, LLC and Eagle Hospitality Properties Trust, Inc. (Eagle), against the County of Los Angeles (County).  Eagle challenges the property tax assessment for the Glendale Hilton Hotel (hotel or property) by the Los Angeles County Assessor (assessor) following Eagle's purchase in 2005, an assessment confirmed by the Los Angeles County Assessment Appeals Board (Board).  In the first appeal, we reversed the grant of summary judgment to Eagle, finding the trial court improperly rendered the decision on an incomplete administrative record that contained disputed issues of fact. (*EHP Glendale, LLC v. County of Los Angeles* (2011) 193 Cal.App.4th 262 (*EHP Glendale*).)  On remand, the trial court held a bench trial on the complete record and entered judgment in the County's favor, affirming the assessor's and the Board's assessment (with one exception for a reduction in the purchase price undisputed by the parties).  Eagle timely appealed that judgment.  We affirm.

## FACTS

We set forth the background facts from our prior opinion, which have not changed (*EHP Glendale, supra*, 193 Cal.App.4th at pp. 264-268 [all footnotes in original]):[1]

### *1.  The Subject Property*

"The property at issue is located near the intersection of Brand Boulevard and Glenoaks Boulevard in the City of Glendale (City).  The 18-story structure, built in 1991, is operated as a full-service first-class hotel with 351 guestrooms, including 13 suites. The hotel encompasses about 285,000 square feet of improvements, including a lobby, administrative offices, hotel laundry, two ballrooms, a 'prefunction' area, seven meeting rooms, a business center, a fitness facility, a gift shop, an outdoor pool and spa with sundeck, two restaurants, a lounge, kitchen facilities and an approximately 196,000-square-foot, five-level, below-grade parking garage accommodating over 500 vehicles.

---

[1]     We add any additional facts as needed in the Discussion part.

*"2.  Hotel Sale and Purchase*

"In January 2005, the Hilton Hotels Corporation (Hilton) offered the hotel for sale. Hilton marketed the property as being located in a prime location, distant from competing Hilton hotels, relatively insulated from new supply, in good physical condition and the only 'four diamond' facility in the San Fernando and San Gabriel Valleys.

"In May 2005, Eagle and Hilton entered into a sale and purchase agreement for Eagle to acquire the hotel.  As part of the transaction, Hilton and Eagle entered into a franchise agreement for Eagle to use the Hilton franchise in exchange for payment of a royalty and a management contract under which Hilton agreed to continue managing the hotel for two years.

"The hotel purchase closed in June 2005.  The purchase price was $79.8 million and included the real property, personal property (e.g., furniture, fixtures and equipment) and certain intangible assets and rights.[2]  Under the stipulated facts, the franchise agreement with Hilton and the management contract were among the intangible assets acquired by Eagle during the sale.

*"3.  Postsale Price Refund*

"Eagle took title to the hotel subject to a covenant running with the land allowing the Glendale Redevelopment Agency (redevelopment agency) to participate in a percentage of the hotel's gross revenue.  Because Hilton was unable to reach a satisfactory agreement with the City to eliminate the redevelopment agency's profit participation, Hilton paid Eagle a postclosing refund of $2.5 million under the terms of the purchase agreement.  The $79.8 million purchase price was effectively reduced to $77.3 million.

*"4.  Property Reassessment*

"After Eagle purchased the property, the assessor reassessed the property as required by Proposition 13.  The assessor initially enrolled a total value for the hotel of

---

[2]    "For discussion purposes all dollar sums are rounded."

$79.8 million, allocating $7.8 million to the land, about $68.5 million to improvements and about $3.4 million to personal property.

**"5. *Appeal to Board***

"Eagle appealed the enrolled assessment to the Board, contending the market value of the property should be decreased to $51 million. Eagle argued that the assessor's methodology for appraising the hotel was invalid and that the assessment impermissibly captured the value of nontaxable intangible assets. The Board held a valuation hearing over the course of six days.

*"A. Eagle's Valuation*

"Eagle argued at the hearing before the Board that the franchise agreement, the management agreement and the assembled hotel workforce had independent value at the time of sale and that the assessor was legally required to deduct those values from the purchase price in the assessment. Eagle further argued that the hotel's various service centers, such as food and beverage, room telephone and telecommunications services, business center, vending machines, health club, guest laundry and parking facilities, were independent businesses whose value also should have been deducted from the hotel's purchase price.

"Eagle's expert appraiser testified he valued the property using all three recognized approaches to value, i.e., sales comparison, income capitalization and cost.[3] Based on all three approaches, his final opinion of the value of the going concern hotel business (including land, improvements, personal property and intangible assets and rights) was $77.3 million.

"As a final step, however, Eagle's appraiser incorporated a value allocation made by another of Eagle's experts who appraised the fair market value of (1) the Hilton flag and franchise, (2) the assembled and trained workforce, and (3) the hotel's various

---

[3] "Assessors have developed three basic methods for determining the full cash value of property, namely, the market data method, the income method and the cost method. (See *Bret Harte Inn, Inc. v. City and County of San Francisco* (1976) 16 Cal.3d 14, 24 (*Bret Harte*).)"

service centers. That analysis resulted in ascribed values of $7.1 million for the franchise, $265,000 for the assembled workforce and $7.3 million for the hotel's various service centers, or a claimed total value for intangible assets and rights of $14.6 million.

"From his final opinion of property value of $77.3 million, Eagle's valuation expert deducted the ascribed value of intangible assets and rights, to account for the 'going concern' value of the hotel business. He concluded that the value of the taxable property (including land, improvements and personal property and *excluding* intangible assets and rights) was $62.6 million.

*"B. Assessor's Valuation*

"During the valuation hearing, the assessor's deputy, whose analysis the assessor adopted, testified he employed the income capitalization approach. Under this method, he analyzed the historical operating revenue and expenses of the hotel and used the data to develop a stabilized income and expense projection for the property as of the June 2005 date of the hotel's change in ownership.

"After projecting the hotel's income revenue from all sources, the assessor's deputy deducted appropriate projected expenses to arrive at a net operating income for the hotel. These deductions from the income stream included Hilton's management and franchise fees, labor costs and marketing expenses.

"Using a direct capitalization technique, also called the 'Rushmore method,'[4] the deputy assessor divided the stabilized net income by a capitalization rate derived from sales of comparable hotels to arrive at the estimated value of the property as of the date of purchase. This calculation yielded an estimated value for the hotel of $76.3 million. Because the value of the real property he obtained from the income capitalization

---

[4] "The deputy assessor testified there was an alternative method of assessment, the 'business enterprise value' method, which was followed by Eagle's experts and espoused by the statewide Assessors' Handbook Section 502. The Assessors' Handbook recommended that intangible rights and assets be separately identified, valued and then deducted from the entire business enterprise as a going concern to arrive at taxable value of the property. (Board of Equalization, Assessors' Handbook Section 502, Advanced Appraisal (Dec. 1998) pp. 156, 158 [(Assessors' Handbook Section 502)].)"

5

approach was close to the hotel's verified sale price, the deputy assessor accepted the verified sales price as the value of the real estate. He then deducted the nontaxable value of the furniture, fixtures and equipment (an undisputed $3.4 million) to arrive at a taxable value of $73.3 million.

"The assessor recommended to the Board that the assessment be adjusted downward by $2.5 million to reflect the seller's refund of part of the sale price for the redevelopment agency's reserved participation interest.

"*C. Board Decision*

"The Board adopted the assessor's property valuation. Through an apparent oversight, however, the Board neglected to adjust the enrolled assessment by deducting the value of the redevelopment agency's $2.5 million retained profit sharing interest as recommended by the assessor.[5]"

## PROCEDURAL HISTORY

### 1. Procedural History Leading to First Appeal

Eagle challenged the Board's determination by bringing the present action seeking a refund of about $187,000 in property taxes. (*EHP Glendale, supra*, 193 Cal.App.4th at p. 268.) Eagle moved for summary judgment, stating that the sole issue concerned "'whether the Board properly equalized the value of [Eagle's] property, based on the evidence presented to the Board'" and contending the assessor's valuation, adopted by the Board, relied on an invalid appraisal methodology that did not fully identify, value, and exclude intangible assets from the assessed property as required by California law. (*Ibid.*) In support of its motion, however, Eagle submitted only fragmentary excerpts of the administrative record. (*Ibid.*)

The court granted the motion, ruling the Board erred as a matter of law in adopting the assessor's methodology because it failed to fully exclude nontaxable intangible assets from the property assessment. (*EHP Glendale, supra*, 193 Cal.App.4th at p. 268.) The

---

[5]     "The County concedes, and there is no dispute, that the hotel's assessment should be adjusted downwards by $2.5 million for this profit participation interest."

6

court reasoned that the applicable standard of review was for the court to "'examine the underlying record for *substantial evidence* and to ascertain whether the Board *applied a valid appraisal technique correctly*,'" and held that the assessor's "'methodology failed to provide for a return *on* the non-taxable operating assets in the total amount deducted from the hotel's income stream.'" (*Id.* at p. 269.) After denying a motion by the County to clarify the ruling, the court entered judgment in Eagle's favor, declaring the assessor's "'valuation methodology, which was adopted by the [Board], necessarily failed to exclude the value of intangible assets from the assessment of [Eagle's] property, the [hotel], and is contrary to California law.'" (*Id.* at pp. 269-270.) The judgment remanded Eagle's assessment appeals application to the Board for further proceedings consistent with the court's ruling on summary judgment.[6] The County appealed from the judgment, and Eagle cross-appealed from a later denial of a motion for attorney fees. (*Ibid.*)

## 2. *Our Decision in the First Appeal*

We determined the trial court erred in two respects. First, we held the issue presented to the trial court "amounted to one of fact, and the trial court erred in granting summary judgment based on a fragmentary record." (*EHP Glendale, supra*, 193 Cal.App.4th at p. 272.) In doing so, we ruled the income approach applied by the assessor was a valid methodology for determining full cash value, so "Eagle's contention that the assessor improperly applied the income approach by not deducting intangibles presents a question of fact." (*Ibid.*) Because "the issue whether the Board's findings are supported by substantial evidence presupposes that the trial court has before it *all* the evidence considered by the Board in making its assessment," and neither Eagle nor the County provided the court with the full administrative record, "the absence of a complete record of proceedings prevents a substantial evidence review." (*Id.* at pp. 272-273.) We rejected Eagle's argument that the trial court did not exceed its jurisdiction because the

---

**6** The trial court also found the Board erred in the assessment of Eagle's property by failing to exclude the $2.5 million postclosing refund from the assessed value. (*EHP Glendale, supra*, 193 Cal.App.4th at p. 270, fn. 8.)

facts were undisputed and thus the issue was one of law reviewed de novo. (*Id.* at p. 273.) We distinguished a line of cases Eagle cited because they "did not review valuation decisions calling for the weighing of facts and are wholly inapplicable to the case at bar." (*Ibid.*, citing *GTE Sprint Communications Corp. v. County of Alameda* (1994) 26 Cal.App.4th 992, 999 (*GTE Sprint*), *Mola Development Corp. v. Orange County Assessment Appeals Bd.* (2000) 80 Cal.App.4th 309, 316, 328, *County of Stanislaus v. Assessment Appeals Bd.* (1989) 213 Cal.App.3d 1445, 1450 & *County of Orange v. Orange County Assessment Appeals Bd.* (1993) 13 Cal.App.4th 524, 529-530 (*County of Orange*).)

Second, we held there were triable issues of material fact in dispute even on the incomplete record. (*EHP Glendale, supra*, 193 Cal.App.4th at p. 273.) We explained the income method and the Board's role in property valuation, and found the parties' valuations presented a factual dispute not amenable to summary judgment: "In the present case, one of the methods Eagle's expert appraiser used to value the hotel property was the income method. However, the expert opined a further deduction should be made from this value for intangibles such as the Hilton franchise, assembled workforce and other profit centers. The deputy assessor, on the other hand, testified that because in his income approach he removed the value of intangibles from the income stream, a further deduction from the valuation for the hotel's service centers would not accurately reflect the property's true value as a full-service lodging facility. [¶] The Board considered the evidence regarding which, if any, amounts should be deducted from the property value to account for the value of intangibles. In doing so, the Board properly weighed the evidence presented by Eagle and the assessor, and the Board appropriately exercised its judgment on the credibility of the testimony and evidence presented, selecting the assessor's valuation over that of Eagle's expert. [Citation.] [¶] In granting the summary judgment, the court found the assessor's methodology 'necessarily failed to exclude from his valuation certain intangible assets, such as a return on the franchise and management expenses, from his going concern valuation methodology,' and that the Board's subsequent adoption of the assessor's income approach 'is contrary to California law.' In

making this determination, the court impermissibly weighed and drew inferences from the conflicting evidence." (*EHP Glendale, supra*, at p. 275, fn. omitted.)

Finally, we distilled the disputed issue to one of the competing credibility of the parties' witnesses:  "The court effectively made a credibility determination in favor of the opinions of Eagle's experts over the opinion of the assessor and his deputy.  Whether the testimony of one group of experts was more persuasive than the expert opinion of another was an issue to be decided by the Board.  The role of the trial court and this court is to decide whether substantial evidence supports the Board's finding as to valuation.  'The actual weighing of conflicting evidence by the factfinder is a process which can never take place in the context of a summary judgment motion.'  [Citations.]  In view of the deputy assessor's testimony that his valuation *excluded* in particular the value of intangibles, the trial court could not make a finding that such valuation 'necessarily' failed to do so.  [¶]  'Where a witness has disclosed sufficient knowledge, the question of the degree of knowledge goes more to the weight of the evidence than its admissibility.'  [Citations.]  The question of credibility of the experts was a matter to be decided by the Board."  (*EHP Glendale, supra*, 193 Cal.App.4th at pp. 275-276, fn. omitted.)  We concluded "Eagle was not entitled to a trial de novo in the trial court.  The question presented to the court was whether ""'there was evidence of sufficient substantiality before the board to justify the finding [citation], and in the absence of fraud or malicious or arbitrary use of its powers the board is the sole judge of questions of fact and of the values of property.  [Citation.]""'  [Citation.]  It is presumed the Board has properly performed the duties entrusted to it and, absent a showing otherwise by the taxpayer, the presumption is that the assessment of the Board is both regularly and correctly made.  [Citation.]."  (*Id.* at p. 276.)

### 3.  *Proceedings on Remand*

On remand to a different judge, the case was tried based upon the entire record and arguments from the parties.  In a written decision and judgment, the court summarized in considerable detail the evidence each side presented to the Board and the Board's findings.  It quoted the standard of review from our prior opinion and explained its view

9

of the issues presented: "Thus, the Court finds . . . it is faced with a question of law: is the assessor's income (Rushmore-type) approach arbitrary, in excess of discretion, or in violation of the standards prescribed by law and/or supported by substantial evidence[?] Further, if the methodology passes the *Bret Harte* test, the Court finds that it is faced with a question of fact: is the decision of the Board upholding the assessor's appraisal supported by substantial evidence[?]"

The court reviewed the Board's decision and resolved the issues against Eagle. First, it found "the Board, in making a finding that [Eagle] did not meet its burden of proof of rebutting the reliability of the property's acquisition value as a basis for its assessment, relied upon a finding that the assessor is . . . more credible and that his position is supported by the evidence presented by the assessor." Second, it held the assessor's and Board's use of the "Rushmore-like approach" was not arbitrary, in excess of discretion, or in violation of the standards prescribed by law. Finally, the court reviewed in detail the evidence presented to the Board and held there was "substantial evidence to support [the Board's] decision in favor of the assessor." The court remanded the matter to the Board to deduct from the assessment the undisputed $2.5 million reduction in purchase price.

## DISCUSSION[7]

### 1. *Law of the Case*

In the prior appeal, we held the issue before the trial court was one of fact, and therefore subject to the "substantial evidence" standard of review. (*EHP Glendale,*

---

[7] The County argues we should not reach the merits of Eagle's appeal because Eagle did not fairly summarize the record. Eagle's brief, however, adequately set forth the pertinent facts. (Cal. Rules of Court, rule 8.204(a)(2)(C).) Eagle argues the Board's findings did not "include all legally relevant subconclusions supportive of its ultimate decision so that a reviewing court is able to trace and adequately examine the Board's mode of analysis. [Citations.] While it is not necessary for the findings to cover every evidentiary matter, the Board should address specifically its reasoning for accepting or rejecting each issue raised by the parties. [Citation.]" (*Farr v. County of Nevada* (2010) 187 Cal.App.4th 669, 686.) We find the Board adequately addressed the issues to enable our review.

10

*supra*, 193 Cal.App.4th at pp. 272-273.) Eagle urges us to "clarify or limit" that holding because it disagrees the issue is factual, citing the *GTE Sprint* line of cases we had distinguished, as well as the newly issued decisions in *Sky River LLC v. County of Kern* (2013) 214 Cal.App.4th 720 (*Sky River*) and *Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593 (*Elk Hills*). The County responds that our prior decision constitutes law of the case, which validated the Board's use of the income approach and limited Eagle to challenging whether substantial evidence supported the Board's decision. We agree.

"Where an appellate court states in its opinion a principle or rule of law necessary to its decision, that principle or rule becomes the law of the case. [Citation.] The law of the case must be adhered to both in the lower court and upon subsequent appeal. [Citation.] This is true even if the court that issued the opinion becomes convinced in a subsequent consideration that the former opinion is erroneous. [Citation.]" (*Santa Clarita Organization for Planning the Environment v. County of Los Angeles* (2007) 157 Cal.App.4th 149, 156.)

Because the rule is "harsh," courts "have declined to adhere to it where its application would result in an unjust decision, e.g., where there has been a manifest misapplication of existing principles resulting in substantial injustice, or where the controlling rules of law have been altered or clarified by a decision intervening between the first and second appellate determinations. The unjust decision exception does not apply when there is a mere disagreement with the prior appellate determination." (*Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 491-492 (*Morohoshi*).) Further, the "primary purpose served by the law-of-the-case rule is one of judicial economy," but "[t]hat reason for the rule is inoperative when the court hearing the subsequent appeal determines that there should be a reversal on a ground that was not considered on the prior appeal. The fact that reversal is necessary in any event frees us from the compulsion that the rule of law of the case might otherwise impose on us to follow a ruling in the prior appeal that we now perceive to be manifestly erroneous." (*Searle v. Allstate Life Ins. Co.* (1985) 38 Cal.3d 425, 435 (*Searle*).)

11

Eagle argues our holding validating the assessor's methodology and finding the issue before the trial court was subject to the substantial evidence review was not necessary to our prior decision that the trial court erroneously granted summary judgment on an incomplete record and on disputed facts. Yet, to find the trial court erred in granting summary judgment, we necessarily decided the assessor's methodology was legally valid, that the remaining issue was one of fact and not law, and that the court's review was for substantial evidence that presupposed a complete record. (*EHP Glendale, supra*, 193 Cal.App.4th at pp. 271-272.) We even rejected Eagle's argument that "the issues presented to the court were based on uncontested or undisputed facts and thus presented solely issues of law, as to which review is de novo," finding review of the Board's exclusion of intangible assets "call[ed] for the weighing of facts." (*Id.* at p. 273.)

Eagle also invokes the exceptions in *Morohoshi* and *Searle*, but they do not apply here. Eagle's claimed "substantial injustice" is simply a disagreement with our conclusion that *GTE Sprint* and other cases are distinguishable. Further, the exception from *Searle* does not apply because we have not identified any reason not considered in our prior decision that would warrant a reversal of the trial court's decision.

Finally, neither *Sky River* nor *Elk Hills* changed the controlling rules of law regarding the proper standard of review. Like *GTE Sprint* and the other cases we previously cited, the dispute in *Sky River* was over which of two tax rates should have been used as an "element of the chosen method to be used in calculating the market value of the property," an issue that did not call for the weighing of facts. (*Sky River, supra*, 214 Cal.App.4th at p. 731.)

*Elk Hills* addressed whether the State Board of Equalization (SBE) improperly included the value of intangible emission reduction credits (ERCs) when it assessed the taxable value of a power plant. (*Elk Hills, supra*, 57 Cal.4th at pp. 601-602.) In reviewing the grant of summary judgment to the SBE and Kern County, the court identified the primary issue as one of statutory interpretation, which it reviewed de novo as a question of methodology. (*Id.* at pp. 605-606.) It also approved the SBE's application of the income approach, even though the SBE did not subtract any value for

12

the ERCs from the income stream.  (*Id.* at p. 619.)  Here, as we previously held, the issue is not whether the assessor used a valid methodology, but whether the assessor subtracted an *adequate value* for intangible assets from the income stream of the hotel, which called for the Board to weigh conflicting evidence and testimony.

Thus, our holding that the Board applied a legally valid methodology and the standard of review was for substantial evidence is law of the case.  The sole question before the trial court and presented in this appeal is whether substantial evidence supported the Board's assessment.[8]

## 2.  *Standard of Review*

"When a taxpayer challenges a decision of the board of equalization claiming the board 'erroneously applied a valid method of determining full cash value, the decision of the board is equivalent to the determination of a trial court, and the trial court in turn may review only the record presented to the board.  [Citations.]  The trial court may overturn the board's decision only when no substantial evidence supports it, in which case the actions of the board are deemed so arbitrary as to constitute a deprivation of property without due process.  [Citations.]" (*EHP Glendale, supra,* 193 Cal.App.4th at p. 271; see also *Elk Hills, supra*, 57 Cal.4th at p. 606.)  On appeal, we apply the same standard of review.  (*Freeport-McMoran Resource Partners v. County of Lake* (1993) 12 Cal.App.4th 634, 640; *Dennis v. County of Santa Clara* (1989) 215 Cal.App.3d 1019, 1025-1026.)

## 3.  *Substantial Evidence Supported the Board's Decision*

In California, property taxes are assessed based on the "fair market value" of the property.  (Cal. Const., art. XIII, § 1; *Elk Hills, supra*, 57 Cal.4th at p. 606.)  "Fair market value means 'the amount of cash or its equivalent that property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take

---

[8]    In light of this conclusion, the trial court erred on remand in identifying one issue as whether, as a matter of law, the assessor's methodology was valid.  But because the court held it was, the error did not impact the court's judgment affirming the Board's decision.

13

advantage of the exigencies of the other, and both the buyer and the seller have knowledge of all the uses and purposes to which the property is adapted and for which it is capable of being used.'" (*Elk Hills, supra*, at p. 606; see Rev. & Tax. Code, § 110, subd. (a).**9**) The "fair market value" or "full cash value" is presumed to be the purchase price of the property, "unless it is established by a preponderance of the evidence that the real property would not have transferred for that purchase price in an open market transaction." (§ 110, subd. (b); see *EHP Glendale, supra*, at p. 274.) Because "[t]he Board is vested with special expertise in property valuation and its factual determinations are treated with deference," the property owner bears the burden to present evidence to the Board demonstrating that a valuation different from the purchase price is warranted. (*EHP Glendale, supra*, at p. 274; see § 110, subd. (b).)

"Assessors have developed three basic methods for determining the full cash value of property, namely, the market data method, the income method and the cost method. [Citation.]" (*EHP Glendale, supra*, 193 Cal.App.4th at p. 266, fn. 3.) Under the income method, "the sum of income attributable to the property is capitalized to reach a value for the property, less an allowance for the risk of partial or no receipt of income." (*Id.* at p. 274.) "The income method is based on the assumption that in an open market a willing buyer would pay a willing seller an amount approximately equal to the present value of the income to be derived from the property." (*Ibid.*)

In applying any valuation method, intangible assets must be excluded because they are generally not subject to direct property taxation, although "[t]axable property may be assessed and valued by assuming the presence of intangible assets or rights necessary to put the taxable property to beneficial or productive use." (§§ 110, subds. (d) & (e), 212, subd. (c); see *GTE Sprint, supra*, 26 Cal.App.4th at p. 1002.)**10** Thus, the value of

---

**9**    All undesignated statutory citations are to the Revenue and Taxation Code.

**10**    Section 110, subdivision (d) states in relevant part, "Except as provided in subdivision (e), for purposes of determining the 'full cash value' or 'fair market value' of any taxable property, all of the following shall apply:  [¶]  (1) The value of intangible assets and rights relating to the going concern value of a business using taxable property

14

intangible assets may not be reflected in the valuation of taxable property, but considering the presence of intangibles may be necessary to value real property at its fair market value. (*Michael Todd Co. v. County of Los Angeles* (1962) 57 Cal.2d 684, 696; *American Sheds, Inc. v. County of Los Angeles* (1998) 66 Cal.App.4th 384, 392-393 (*American Sheds*); see also *Los Angeles SMSA Ltd. Partnership v. State Bd. of Equalization* (1992) 11 Cal.App.4th 768, 776 (*Los Angeles SMSA*) ["'[I]ntangible values that cannot be separately taxed as property may be reflected in the valuation of taxable property . . . . [T]he propriety of including nontaxable intangible values in the valuation of otherwise taxable property has been asserted by the courts in a variety of contexts, and market value for assessment purposes is the value of property when put to beneficial or productive use.' [Citation.]"].)

The court in *Elk Hills* recently clarified the relationship between intangible assets and the valuation of real property at fair market value under sections 110, subdivisions (d) and (e), and section 212, subdivision (c). "[S]ection 110(d)(1) and (2) prevents the direct taxation of intangible rights and assets when assessors use methods of unit valuation. Section 110(d)(1) prevents tax assessors from including the value of

shall not enhance or be reflected in the value of the taxable property. [¶] (2) If the principle of unit valuation is used to value properties that are operated as a unit and the unit includes intangible assets and rights, then the fair market value of the taxable property contained within the unit shall be determined by removing from the value of the unit the fair market value of the intangible assets and rights contained within the unit." Subdivision (e) states, "Taxable property may be assessed and valued by assuming the presence of intangible assets or rights necessary to put the taxable property to beneficial or productive use." And subdivision (f) states, "For purposes of determining the 'full cash value' or 'fair market value' of real property, intangible attributes of real property shall be reflected in the value of the real property. These intangible attributes of real property include zoning, location, and other attributes that relate directly to the real property involved." Section 212, subdivision (c) provides, "Intangible assets and rights are exempt from taxation and, except as otherwise provided in the following sentence, the value of intangible assets and rights shall not enhance or be reflected in the value of taxable property. Taxable property may be assessed and valued by assuming the presence of intangible assets or rights necessary to put the taxable property to beneficial or productive use."

intangible assets that relate to the going concern value of a business within the unit value of property prior to assessment. Section 110(d)(2) requires taxing authorities to value intangible assets and actively remove that value from a unit's taxable base value, so that the intangibles are not directly taxed." (*Elk Hills, supra*, 57 Cal.4th at p. 608.) But in the context of the going concern value of a business (i.e., "'[t]he value of a commercial enterprise's assets or of the enterprise itself as an active business with future earning power, as opposed to the liquidation value of the business or of its assets'"), section 110, subdivision (e) permits taxable property to be "'assessed and valued by assuming the presence of intangible assets or rights necessary to put the taxable property to beneficial or productive use.'" (*Elk Hills, supra*, at p. 608.)

Thus, "[s]ection 110(d)(1) prevents *the value* of intangible assets from enhancing or being reflected in the valuation of taxable property. Section 110(e) allows assessors to enhance the valuation of taxable property, not by including *the value* of intangible assets in the valuation (see § 110(d)(1)), but simply by *assuming the presence* of intangible assets when valuing the taxable property put to beneficial or productive use. While the value of the taxable property is enhanced, it is not enhanced by *the value* of intangible assets. That would violate section 110(d)(1) as well as section 212(c). Rather, it is enhanced by *the presence* of intangible assets." (*Elk Hills, supra*, 57 Cal.4th at p. 615.)

As we noted in our prior opinion, the issue before the Board was a factual question essentially resting on a credibility determination between dueling experts. (*EHP Glendale, supra*, 193 Cal.App.4th at pp. 275-276.) In ruling for the assessor, the Board adopted the opinion and valuation from the County's deputy assessor Richard House, a licensed assessor with an advanced certificate who, throughout his career at the county assessor's office, had concentrated on commercial properties, shopping centers, strip retail centers, and supercenters. At the time of the hearing, he had specialized in hotel valuation for the past four years and served as the hotel appraiser for the County. In assessing the hotel in issue, he reviewed overall trends in the hospitality market and submarket; he studied the hotel's historical operations and made projections of future use based on its history; he projected the hotel's income revenue from all sources and

16

deducted appropriate expenses and projected expenses to arrive at a net operating income; and he analyzed market rates to derive a capitalization rate with which to capitalize that income into a value estimate for the property. He then deducted furniture, fixtures, and equipment from the value estimate to reach a base value for the property.

In valuing the property, House viewed the purchase price as reflecting the value of only the taxable real and personal property. (*EHP Glendale, supra*, 193 Cal.App.4th at p. 276, fn. 12.) His opinion was based in part on the terms of the purchase agreement, which included a general assignment of intangible property, "including without limitation all operations and businesses conducted on or from the Real Property," but it did not identify the value of any particular intangible assets; excluded the Hilton trademarks and other intellectual property; provided that the parties would execute separate franchise and management agreements as conditions to closing, which were separately paid for through royalties and fees; and provided that all employees would either be terminated upon sale and rehired by Eagle or continue to be employed by Hilton and managed under the management agreement for the benefit of Eagle. In House's view, the value of the workforce was therefore subsumed in the management agreement because managing the workforce was one of the activities to be performed under that agreement.

House also did not view any service centers present in the hotel as assets that could be separated from the purchase price of the hotel as an intermingled operation.[11] Eagle acquired the hotel as a "full-service" hotel, defined as "[g]enerally mid-price, upscale or luxury lodging facilities with a restaurant, lounge facilities, and meeting space as well as minimum service levels often including bell service and room service. These lodging facilities report food and beverage revenue." The property on which the hotel sits is limited to first-class hotel use, which was the "highest and best use" of the property. As a result, House looked at the hotel "under the concept of the unit valuation

---

[11] The Board did not expressly resolve the issue of the service centers, but it accepted House's opinion, and he did not view the service centers as intangible assets that could be separately valued. The Board did discuss the separate valuation of the service centers by Eagle's expert.

17

as an operation as a whole," which is the way "market participants would view this property."

In applying the income approach to confirm the purchase price as the taxable full market value, House identified the franchise and management agreements as intangible assets that should be removed from the income stream of the hotel.[12]  He testified he removed their value by using what has been termed the "Rushmore method" of income valuation, that is, subtracting the expenses for intangible assets from the income stream of a property before capitalization in order to remove their value from the final valuation. He opined that, because "capitalization is the process of converting income into value, . . . to remove income from the capitalization process is in effect to remove value, . . . and it is an acceptable methodology to value the value of intangibles by removing them as an expense from the income stream."  He also removed more than $1.3 million from the income stream (capitalized to $15 million) beyond the expenses for the franchise and management agreements, which he opined were shared expenses, some of which likely benefitted the service centers.  In all, he removed 14.6 percent from total revenue, and capitalizing the net income, he reached $73.3 million, an amount close to the purchase price of the real estate alone, not the intangibles and not the personal property.  Had he not deducted the expenses for the franchise and management agreements from the projected income from the property, the income method in his opinion would have yielded a value reflecting "land, improvements, personal property, and the value of those intangibles assets such as the management and franchise agreement[s].  But the value would have been much[,] much higher," i.e., a "true going concern value of $113,803,000."

He conceded he was unaware of any statute or court decision in California supporting his approach.  He also noted that the SBE disagreed with his method in the

---

[12]     House clarified at the hearing that he did not view the management and franchise agreements as intangible "attributes" under section 110, subdivision (f).

Assessors' Handbook Section 502, but that no assessor in California follows Section 502 on that issue.

In contrast, in applying the cost, sales comparison, and income methods to reach a valuation, Eagle's expert appraiser produced what he claimed was a "going concern" value of $77.3 million, reflecting the value of both taxable real and personal property and nontaxable intangible assets (sometimes called the "Business Enterprise Approach"). Like House, in applying the income approach, Eagle's appraiser subtracted expenses from the income generated by the hotel, and capitalized the result to determine the value of the hotel. As a final step, however, he deducted from his valuation the value of three categories of intangible assets calculated by Eagle's intangible valuation expert: (1) the Hilton flag and franchise, (2) the assembled and trained workforce, and (3) the hotel's various service centers. The resulting valuation was approximately $63 million in taxable real and personal property.

The Board accepted House's valuation: "The Board reviewed the points raised by both the applicant and the Assessor as to the two approaches to valuing hotels and related properties. There is obviously a difference in opinion as to the use of the Rushmore Approach and the Business Enterprise Approach. During the Board's deliberation, the decision regarding the first and only trial where Stephen Rushmore, the creator of the Rushmore Approach, and David Lennhoff, who developed the Business Enterprise Approach method; faced each other in court was reviewed. It has been reported by some sources that methodology known as the 'Business Enterprise Approach' (BEA), has recently come into favor with hotel property tax representatives and some appraisers, given that it moves a disproportional share of [a] hotel's value out of the real property component and into the business [and] personal property components, thereby significantly reducing a hotel property tax assessment. As defined in the Uniform Standards of Professional Appraisal Practice, BEA refers to the value of the entire business enterprise and includes all tangible assets and intangible assets and rights, trade names, logos, system operations, advertising, customer and distribution relationships, and workforce are all components of an[] enterprise value that create value separate and apart

19

from, and value inherent in the tangible assets. [¶] The Board finds that the Assessor correctly allowed for the intangibles, through marketing and franchise expenses. The Board realizes that the SBE Handbook is a guide and is not binding on the Assessor or local Assessment Appeals Boards. [¶] After hearing all oral testimony and exhibits by the applicant and appraiser, the Board finds that the applicant did not meet the burden of proof, therefore this application is denied."

Eagle challenges the Board's conclusion because, in its view, the income approach to valuation always results in a "business enterprise value" that necessarily includes the value of intangible assets that must be excluded. Eagle cites several cases to argue, as a matter of law, "an income approach includes or subsumes the value of the intangible assets required to generate the revenue." (See, e.g., *GTE Sprint, supra*, 26 Cal.App.4th at p. 1007; *Service America Corp. v. County of San Diego* (1993) 15 Cal.App.4th 1232, 1240; *Shubat v. Sutter County Assessment Appeals Board* (1993) 13 Cal.App.4th 794, 803; *County of Orange, supra*, 13 Cal.App.4th at p. 533; *County of Los Angeles v. County of Los Angeles Assessment Appeals Bd.* (1993) 13 Cal.App.4th 102, 113; *Los Angeles SMSA, supra*, 11 Cal.App.4th at p. 776, fn. 6; *Madonna v. County of San Luis Obispo* (1974) 39 Cal.App.3d 57, 61 (*Madonna*).) But the issue we must decide is not whether the income approach to valuing a business necessarily includes the value of intangible assets; we must determine whether substantial evidence supported the Board's decision that, *under the facts of this case*, the assessor properly removed the value of intangible assets from the hotel's valuation. We conclude the assessor did.

As a starting point, the fair market value is presumed to be the purchase price of the property (§ 110, subd. (b); Cal. Code Regs., tit. 18, § 2, subd. (b); *EHP Glendale, supra*, 193 Cal.App.4th at p. 274), and here, the Board had before it evidence that the purchase price reflected only the value of the taxable real and personal property.[13] The

_____

[13]    While the Board found the "*purchase* included the real estate, furniture, fixtures, equipment, the assembled workforce and business center within the hotel separate from the rooms, in conjunction with the franchise and related management agreements" (italics added), the Board did not expressly address the components of the purchase *price*. By

20

terms of the purchase agreement supported the Board's conclusion that the value of the franchise and management agreements (as well as the workforce, subsumed in the expense for the management agreement) were separate from the purchase price. Even though Eagle's representative who signed the purchase agreement testified Eagle would not have bought the hotel and the purchase price would have been less without the Hilton franchise in place, this was a factual dispute and the Board was entitled to credit the assessor's evidence over Eagle's. We find substantial evidence supported the Board's decision on this point. (See *American Sheds, supra*, 66 Cal.App.4th at p. 394 [rejecting similar argument that assessor's valuation must have included intangible assets because it equaled the purchase price for both tangible and intangible assets when the taxpayer gave additional consideration for the purchase].)

The assessor also reasonably viewed the presence of the service centers as part of the valuation of a full-service hotel operating at its beneficial and productive use. We agree with the trial court that "[t]he Board was reasonable in determining that [the service centers] are among the features of an upscale hotel and that to remove them would change the revenue, expense and service profile of the hotel." This conclusion was based on the assessor's "unit valuation" of the hotel assuming the presence of the service centers for a full-service, first-class hotel. As noted above, under unit valuation, the assessor was permitted to assume the *presence* of intangible assets in the valuation of the

---

accepting House's valuation, though, the Board implicitly found the price did not include the value of nontaxable assets. Nor did any prior decision in this case analyze the components of the purchase price. We merely noted in our prior opinion "[t]he purchase price was $79.8 million and included the real property, personal property (e.g., furniture, fixtures and equipment) and certain intangible assets and rights. Under the stipulated facts, the franchise agreement with Hilton and the management contract were among the intangible assets acquired by Eagle during the sale." (*EHP Glendale, supra*, 193 Cal.App.4th at p. 265, fn. omitted.) While the trial court found the "total consideration that [Eagle] paid for the [h]otel" included "land, building improvements, fixtures, business personal property and some intangible assets," it also expressly held the "assessor in this case did not include components of value for business enterprise value and other intangibles over and above the value of the realty."

taxable property, but not their *value*. (*Elk Hills, supra*, 57 Cal.App.4th at p. 615.) There is no evidence to suggest the assessor included separate values for the service centers in assuming the purchase price was the full market value of only the taxable property. Instead, he merely opined the "highest and best use" of the property was as a full-service, first-class hotel, which was the only permitted use of the land. A deduction from the purchase price as urged by Eagle would have altered the character and profile of the full-service hotel and would have violated the requirement that the hotel be assessed at its full market value, including by assuming the presence of intangible assets. In order to value the property at its full market value, the assessor was entitled to assume the presence of the service centers necessary to that operation.

We also find substantial evidence supported the Board's conclusion that House properly removed the value of the identified intangible assets in his application of the income approach by subtracting the expenses of intangible assets from the income stream to be capitalized. Eagle argues House's valuation did not comply with property tax Rule 8(e) (Cal. Code Regs., tit. 18, § 8, subd. (e) (Rule 8(e))),[14] which describes two general methods for estimating future income: using "[r]ecently derived income and recently negotiated rents or royalties" of the property or comparable property, so long as the rents "are reasonably indicative of the income the property will produce in its highest and best use under prudent management"; or, as House did, using "income from operating a property," so long as sufficient income is excluded "to provide a return on working capital and other nontaxable operating assets and to compensate unpaid or underpaid management."[15]

_____

**14** The Board did not expressly address Rule 8(e), but again, by accepting House's valuation, the Board implicitly found his appraisal complied with Rule 8(e).

**15** Rule 8(e) states in full, "Recently derived income and recently negotiated rents or royalties (plus any taxes paid on the property by the lessee) of the subject property and comparable properties should be used in estimating the future income if, in the opinion of the appraiser, they are reasonably indicative of the income the property will produce in its highest and best use under prudent management. Income derived from rental of properties is preferred to income derived from their operation since income derived from

22

Eagle and amicus curiae American Seniors Housing Association chiefly object to House's valuation under Rule 8(e) because, in their view, he did not subtract an amount for a return *on* the nontaxable assets, as well as an amount for the return *of* the value of the nontaxable assets. As the County points out, the appropriate charge against the hotel's income for contribution of intangible assets utilized in operations was a factual question within the Board's expertise and House provided ample support for his estimate of expenses for the intangible assets, which were based on marketplace rates estimated from prior years of the hotel's operations and industry data for similar hotels. Indeed, House testified that the hotel's owner before Hilton was superior in its management of the hotel, producing higher net incomes in 2000 and 2001 than Hilton produced in 2003 and 2004, from which the Board could have inferred that no further deduction was warranted for a return on the intangible assets such as the franchise and management agreements because they did not carry a value beyond the market rate for those assets.[16]

House acknowledged his valuation conflicted with the SBE's guidance published in the Assessors' Handbook Section 502, *supra*, pages 150 to 165. Citing, inter alia, Rule 8(e), Section 502 provides in pertinent part: "The value of intangible assets and rights cannot be removed by merely deducting the related expenses from the income stream to be capitalized. Allowing a deduction for the associated expense does not allow for a return on the capital expenditure. For example, allowing the deduction of wages paid to a skilled work force does not remove the value of the work force in place from the income indicator, because the amount of the wages paid does not necessarily represent a return of

operation is the more likely to be influenced by managerial skills and may arise in part from nontaxable property or other sources. When income from operating a property is used, sufficient income shall be excluded to provide a return on working capital and other nontaxable operating assets and to compensate unpaid or underpaid management." Rule 8(e) is binding on assessors and the Board. (Cal. Code. Regs., tit. 18, § 1.)

[16] Eagle claims House's math in deducting expenses was "fundamentally misleading." Eagle also takes issue with House's analysis of the income and expenses for the prior owner and Hilton. These are factual disputes resolved against Eagle, and we will not revisit them.

and on the work force in place, and further bears no relationship to the costs associated with locating, interviewing, training and otherwise acquiring the work force. Similarly, the deduction of a management fee from the income stream of a hotel does not recognize or remove the value attributable to the business enterprise that operates the hotel." (Assessors' Handbook Section 502, *supra*, at p. 162, fns. omitted.)

The County argues the guidance in Section 502 reflects the "flawed assumption" that a management expense (or any expense) results invariably in a positive "return on" that expense that should be recognized in addition to the amount of the expense itself and charged against revenue. To the contrary, competent management of a property is required to put it to beneficial and productive use, and routine charges for that management against a property's revenue (such as for gardening, janitorial, and plumbing services, etc.) are properly accounted for in their market prices, and the appropriate additional return on those assets should be viewed as zero.

There is considerable force to this argument. By its terms, Rule 8(e) requires only *sufficient* income be deducted for a return on nontaxable operating assets. House estimated the value of the intangible assets at market prices, and the market value investors might pay for an intangible asset could include a return on the asset. Equally, if the market rate of an intangible asset reflects that investors do not require a return on the asset, a "sufficient" deduction under Rule 8(e) could be zero, provided that is adequately supported by the record. We can conceive of many types of nontaxable operating assets under Rule 8(e) that would fall into this category, especially in an operation like a hotel that requires many services to put the property to beneficial use, but which may not carry a separate investment value (e.g., housekeeping services).

In its amicus brief, the SBE interprets Rule 8 and Assessors' Handbook Section 502 in a similar manner. It asserts that Section 502 cannot be interpreted to require additional deductions in every case in which the property is an operating business with management and a workforce. Relying on Rule 8(e) and Rule 8(c) (Cal. Code Regs., tit.

24

18, § 8, subd. (c) (Rule 8(c))),[17] it argues that when intangibles are alleged to be included in a valuation of property that relate to "above-average or superior operation of a business enterprise that uses the real property, such as through an exceptional management team or workforce," Rule 8 requires an adjustment in the net operating income to account for that above-average management. Absent superior management or an exceptional workforce, though, the presence of prudent management and a reasonably skilled workforce are required to put a property to its beneficial and productive use, and no additional value needs to be deducted from the income stream. The SBE urges that this approach could be used for other intangible assets, such as a superior trade name associated with an operating property, provided the taxpayer proves its value beyond an "average" trade name.

Eagle refutes the SBE's interpretation, arguing the SBE's current view was set forth in a draft of the Assessors' Handbook Section 502 that was rejected, it misinterprets Rules 8(e) and 8(c), and it ignores cases like *GTE Sprint* that require the removal of intangible assets. We need not comment on the SBE's current views of Section 502 or wade any further into this policy debate. Neither the Board nor the trial court found House's disagreement with Section 502 problematic, nor do we. "[A]ssessors' handbooks are not regulations and do not possess the force of law," although "they serve as a primary reference and basic guide for assessors, and have been relied upon and accorded great weight in interpreting valuation questions. [Citation.]" (*Sky River, supra*, 214 Cal.App.4th at p. 735; see also *Watson Cogeneration Co. v. County of Los Angeles* (2002) 98 Cal.App.4th 1066, 1070, fn. 2.) They "represent 'merely the opinions of the [SBE] staff, and [have] no binding legal effect on boards, assessors, or taxpayers.' [Citation.]" (*Prudential Ins. Co. v. City and County of San Francisco* (1987) 191

---

**17** Rule 8(c), provides in relevant part: "The amount to be capitalized is the net return which a reasonably well informed owner and reasonably well informed buyers may anticipate on the valuation date that the taxable property existing on that date will yield under prudent management and subject to such legally enforceable restrictions as such persons may foresee as of that date."

25

Cal.App.3d 1142, 1155.)  Under the facts presented to the Board, House's deduction of expenses to remove the value of intangible expenses was consistent with Rule 8(e) and was supported by the record, and we find no reason to overturn the Board's decision.

Eagle relies heavily on *GTE Sprint*, arguing that case forecloses the assessor's valuation here.  In that case, the taxpayer challenged an assessment of public utility property based on the income approach, claiming it taxed the value of intangible property.  (*GTE Sprint, supra*, 26 Cal.App.4th at p. 998.)  On de novo review, the court found the assessment invalid because it included the value of intangible assets, rejecting the SBE's argument "that the unit valuation of Sprint's tangible property, as a going concern, necessarily captured *only* the enhancement value of the intangible assets as permitted by law."  (*Id.* at p. 995.)  The court's decision turned on its view that the assessor and the SBE failed to present any evidence to rebut the taxpayer's experts that the value of intangible assets were included in the assessment; instead, the SBE and its appraisers "categorically denied that they taxed the intangible assets, except as they enhanced the value of the tangible property as a going concern."  (*Id.* at p. 1003.)  The SBE's appraisers testified that "they did not look for and made no attempt to value intangible assets" and one even testified that intangible values would not have been deducted even if they existed.  (*Id.* at p. 1004.)  This was merely "lip service to the concept of exempting intangible assets from taxation."  (*Id.* at p. 1005.)  Notably, the court remanded the matter for a reassessment hearing, "at which time the [SBE's] appraisers shall have an opportunity to present evidence rebutting [the taxpayer's] identification and/or valuation of intangible assets.  At that hearing, both parties may present evidence as to the portion of the intangible values, if any, can be deemed to enhance the value of the tangible property."  (*Id.* at p. 1008.)

Given our review is limited to whether substantial evidence supported the Board's decision, *GTE Sprint* is distinguishable.  Far from providing "lip service" to addressing and excluding nontaxable intangible assets, House provided evidence to support his opinion that the purchase price did not include nontaxable intangible values and that he properly removed the value of intangible assets by subtracting expenses from the income

26

stream of the hotel.[18]  We may overturn the decision of the Board only if it was "'so arbitrary as to constitute a deprivation of property without due process.  [Citations.]'" (*EHP Glendale, supra*, 193 Cal.App.4th at p. 271.)  Under this deferential standard of review, we find substantial evidence supported the Board's valuation.

Finally, we briefly address *Elk Hills*, which was decided after oral argument in this case.  In that case, the court addressed the income approach in considering intangible ERCs as part of the valuation of the power plant.  The taxpayer argued in calculating the taxable value of the property using the income approach the SBE failed to attribute a portion of the power plant's income to the ERC's and then deduct that expense from the plant's income stream.  (*Elk Hills, supra*, 57 Cal.4th at p. 617.)  But the court rejected the contention because "under an income stream approach, not all intangible rights have a quantifiable fair market value that must be deducted."  (*Ibid.*)

Analyzing two lines of cases, the court explained in one category of cases "courts have upheld income-based assessments that properly assumed the presence of intangibles assets necessary to the productive use of taxable property without deducting value for intangible assets."  (*Elk Hills, supra*, 57 Cal.4th at p. 618.)  In the other line of cases, including *GTE Sprint*, courts "disapproved assessments that failed to attribute a portion of a business's income stream to the enterprise activity that was directly attributable to the value of intangible assets and deduct that value prior to assessment.  [Citation.] These cases illustrate the principle that although assessors may assume the presence of intangibles when considering the income stream derived from taxable property that is put

---

**18**      Eagle also cites *Madonna, supra*, 39 Cal.App.3d at page 61, involving the valuation of an inn.  In that case, the court affirmed a decision by the county board of equalization that the assessor's capitalization approach improperly included enterprise income, including a portion of the income "'largely predicated on the personal expertise in the management'" of the inn, when it should exclude "'any income from businesses or enterprises carried on in the same property.'"  (*Id.* at p. 60.)  The court found no evidence was offered to correct the assessor's valuation, so the court found the taxpayer's valuation to be proper.  (*Ibid.*)  Like *GTE Sprint*, *Madonna* involved a different set of facts and we do not find it controlling here.

to beneficial or productive use (§ 110(e)), the value of intangibles that directly enhance that income stream cannot be subsumed in the valuation of taxable property (§ 110(d)(1)), and must be deducted from the unit prior to assessment (§ 110(d)(2))." (*Id.* at p. 618.)

The court explained the difference in the two lines of cases is "one of degree; intangible rights like ERCs merely allow for the taxable property to generate income when put to its beneficial or productive use. Thus, their contribution to the income stream is indirect, whereas intangible assets like the goodwill of a business, customer base, and favorable franchise terms or operating contracts all make a direct contribution to the going concern value of the business as reflected in an income stream analysis. Only the latter category of intangible assets and rights has a quantifiable fair market value that must be deducted from an income stream analysis prior to taxation." (*Elk Hills, supra*, 57 Cal.4th at pp. 618-619.) The ERCs in the case fit in the first line of cases because it was undisputed they were legally necessary to put the property to its beneficial and productive use as a power plant and there was "no indication that the [SBE], when it employed the income capitalization approach, valued ERCs in any manner other than by 'assuming their presence' in order to tax the property in question as a fully functioning power plant." (*Id.* at p. 619.)

Our decision here is consistent with *Elk Hills*. With regard to the franchise and management agreements, the assessor complied with *Elk Hills* by deducting the franchise and management fees from the income stream to remove their values from the valuation of the taxable property. *Elk Hills* did not address Eagle's primary argument that the assessor did not deduct *sufficient* value from the income stream to remove the full value of intangible assets under Rule 8(e). As for the service centers, as we noted above, a deduction from the purchase price would have altered the character of the full-service hotel and there was no evidence to suggest the assessor did anything more than assume their presence in valuing the taxable property. As in *Elk Hills*, the assessor's valuation reflected merely the presence of the service centers as an indirect contribution to the operation of a full-service hotel.

28

## DISPOSITION

The trial court's judgment is affirmed.  This matter is remanded to the Board to deduct from the assessment the undisputed $2.5 million paid by reason of the profit participation agreement with the redevelopment agency, as recommended by the assessor and ordered by the trial court.  Respondent is awarded costs.


FLIER, J.

WE CONCUR:


RUBIN, Acting P. J.


GRIMES, J.