Filed 2/18/14  Wheeler v. Allianz Life Ins. Co CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| EMILY LUCILLE WHEELER, | B241324 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. TC023961) |
| v. | |
| ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. William P. Barry, Judge.  Reversed and remanded.

Angel at Law, Brian A. Angelini; Evan D. Marshall for Plaintiff and Appellant.

Murphy, Pearson, Bradley & Feeney, Michael P. Bradley and Jeff C. Hsu for Defendants and Respondents.

* * * * * *

Emily Lucille Wheeler (appellant) appeals from a summary judgment entered in favor of Allianz Life Insurance Company of North America (respondent) and its agent Leonard Ige (Ige)[1] on a complaint for breach of the implied covenant of good faith and fair dealing (bad faith), negligence, elder abuse (Welf. & Inst. Code, § 156000 et seq.), unfair business practices (Bus. & Prof. Code, § 17200), and fraud. Appellant asserted respondent was liable for, among other things, actions allegedly taken by Ige, in selling her the annuity and then aiding and abetting Broderick Jenkins (Jenkins), in the fraudulent withdrawal of the annuity funds. We reverse the summary judgment on the basis that there are triable issues of material fact as to whether respondent is liable for elder abuse in issuing the annuity.

## FACTS AND PROCEDURAL HISTORY

### *The Second Amended Complaint*

The operative pleading, which is the second amended complaint, named as defendants: respondent, its agent Ige, Jenkins, CitiNet Mortgage, Inc. and Christian D.H. Kim. The second amended complaint alleged that Ige is a licensed insurance agent of respondent. Ige at some point worked for CitiNet Mortgage, Inc. Jenkins was the Director of Marketing for CitiNet Mortgage Inc., which was the mortgage broker, which refinanced loans on appellant's real property. CitiNet Mortgage Inc. also employed Kim, who is a licensed real estate broker. The second amended complaint alleged the named defendants were agents, joint venturers, co-conspirators or employees of each other.

The second amended complaint further alleged that, in March 2011, appellant was 72 years old. Jenkins was introduced to appellant by a mutual acquaintance. On or around January 2007, Jenkins visited appellant at her residence and discussed her finances. Jenkins held himself out as an experienced real estate broker and financial advisor with a "financial team" that could help appellant accumulate wealth through certain investment vehicles.

---

[1]    Ige did not file a respondent's brief on appeal.

At the time of the January 2007 meeting with Jenkins, appellant owned a residence, with little or no loan balance and an apartment building with a loan balance of approximately $84,000. Jenkins advised appellant to refinance the properties through CitiNet Mortgage Inc., take out cash and place the funds into the annuity policy purchased from respondent through Ige. The annuity funds would eventually be used to purchase new real estate. The second amended complaint alleged on information and belief that Ige had worked for CitiNet Mortgage Inc. prior to becoming an insurance agent for respondent.

In February 2007, Jenkins and Ige met with appellant at her residence to discuss investing in the annuities. After giving appellant a business card indicating he was a licensed insurance agent with respondent, Ige allegedly "casually uttered that he was thinking of getting back into the real estate business with Jenkins." To fund the annuities, appellant refinanced her apartment building in March 2007 and her residence in May 2007. Appellant received "cash outs" of $295,929.26 for the apartment building and $283,604.74 for the residence. On March 26, 2007, appellant entered into an annuity agreement with respondent, which was issued as Policy No. 70553177. Appellant paid respondent the sum of $125,000 for the initial premium on March 26, 2007 and a second payment of $200,000 on May 29, 2007 for the annuity.

In the spring of 2008, Jenkins contacted appellant and advised her of a real estate investment in San Bernardino. Jenkins urged appellant to withdraw $20,000 from the annuity to fund the real estate investment. On June 23, 2008, Jenkins supplied appellant with a document entitled "Request for Annuity Contract Funds." Respondent required the form to complete a request to surrender funds from the annuity. At the time appellant executed the request, the amount to be surrendered was $20,000 and the section pertaining to the payee was left blank.

Appellant alleged that, without her knowledge or consent, respondent issued a check on July 11, 2008 made payable to a company called Connexx Financial Services in the amount of $220,000. On or around the time the check was issued, respondent sent appellant a letter stating that $220,000 was charged against the annuity pursuant to the

3

release.  Appellant alleged that she telephoned respondent to inquire about the check and asked that a "hold" be placed on the check because she did not authorize a release of $220,000.  Respondent indicated the check had been cashed and appellant had signed the release.  In August 2009, appellant sent respondent a written demand letter requesting reinstatement of the $220,000 into the annuity.

Appellant sought compensatory and punitive damages against respondent on the following theories:  breach of the implied covenant of good faith and fair dealing (bad faith); negligence; elder abuse (Welf. & Inst. Code, § 15610.30 et seq.); unfair business practices (Bus. & Prof. Code, § 17200 et seq.); negligence per se; and fraud.

### The Summary Judgment Motion

After answering the second amended complaint, respondent filed a motion for summary judgment /summary adjudication of issues which was joined by Ige.  For the most part, appellant disputed respondent's separate state of undisputed facts.  Accordingly, the following is a synthesis of the facts.

In 2007, appellant was looking to refinance at least one of the properties she owned.  Appellant had been unsuccessful in refinancing the property prior to that time.  In early 2007, appellant met with Jenkins through her son Aaron.  Jenkins is the cousin of Aaron's girlfriend, Tamiko Powell.  Aaron and Tamiko were both present at the initial meeting between appellant and Jenkins.  The parties disagree as to whether Jenkins was introduced as a real estate man but agree that Jenkins represented that he could provide financial services.  According to appellant, Jenkins said he had a "financial team" that could help appellant become wealthy.

Ige was introduced to appellant in a subsequent meeting with Jenkins in February or March 2007.  Appellant's son Aaron was present at the meeting.  The parties disagree as to what was said in this meeting. Respondent claims Ige was introduced as a licensed insurance agent, who worked as respondent's agent.  Appellant claims that Ige was actually introduced as part of Jenkins' investment team and his partner.  According to appellant, Ige stated that "he was thinking of getting back into the business with Jenkins."

4

The parties also disputed whether respondent had a relationship or affiliation with Jenkins. Respondent maintained that Jenkins is not respondent's agent and had no affiliation with respondent. Rather, Ige was connected to Jenkins from Ige's past employment with CitiNet Mortgage where they met in 2006. Appellant asserted that respondent had a relationship to Jenkins because of the representations made by Ige and Jenkins in the February 2007 meeting. Appellant cited evidence that Jenkins had referred insurance clients to Ige in the past.

Ige left CitiNet Mortgage in 2007 and became an insurance agent for respondent in the same year. Around that time, he received a telephone call from Jenkins. Jenkins said he had a client who wanted to invest in life insurance. Ige denied being informed that the money was from the refinance of the client's property. Appellant claimed Ige knew that a refinance was done and that some of the money for the annuity would come out of the refinance.

According to respondent, Ige was told that appellant wanted to invest her money safely and did not want to subject her money to stock market volatility. The money would be put away for a long term investment. Appellant did not have any immediate need and the money would be passed on to her heirs. Appellant's version of what occurred at the meeting was very different. She claimed that Ige and Jenkins told her that she was going to refinance her properties, take the money out and invest it with Ige. Appellant was advised to refinance both the investment and residential properties and put the money in the annuity. When the real estate market went down, she would invest in real estate in San Bernardino by taking the money out of the "annuity." Appellant was also told she should sign up for insurance for her children and grandchildren for purposes of long term life insurance.

Ige recalls that appellant was elderly but lucid during the meeting. Appellant did not know the difference between an annuity and life insurance. Appellant did not recall an annuity being discussed at the March 2007 meeting. Prior to the meeting, appellant did not have any intention of buying a life insurance policy. Appellant had a life insurance policy but she did not own any annuities.

5

Ige, through his employer, determined that based on appellant's stated goals and needs, a MasterDex 10 annuity might be appropriate. Appellant denied that her goals were discussed during the March 2007 meeting. Rather, Ige was told appellant wanted to leave her properties free and clear for her children. Appellant "was going to refinance her properties, place money into investments, with Ige, let the interest grow, then when the market goes down, invest in real estate in San Bernardino by taking cash out of the annuity." Appellant testified at her deposition that in obtaining the annuity her primary goal was to pass money on to her grandchildren. Appellant had no other objectives in obtaining the annuity.

In a second meeting between Ige and appellant, Ige presented appellant with an application for the MasterDex 10 annuity. According to respondent, at the meeting, Ige explained all the features of the annuity and assisted appellant in filling out the application. Ige asked appellant questions and wrote down her responses on the application, which is a common practice in the insurance industry. Ige declared that appellant appeared to understand what he was explaining. Appellant then signed the application. Ige gave appellant a statement of understanding and asked her to complete an Allianz product suitability form. The statement of understanding states the features and obligations of the MasterDex 10, including early surrender penalties, the immediate bonus to Ige on deposit, annuitization period and payout options. The MasterDex 10 included an automatic 10 percent bonus added to any deposited funds. The annuity also had a 30-day "free-look" period. Appellant was free to cancel the annuity contract at any time during the period and receive a full refund of the paid premium.

Appellant did not recall that an annuity was discussed at the meeting. She did not remember ever seeing the application or ever filling it out. Appellant did not provide the information in the application for the annuity. The product suitability form indicated appellant's net worth was $1 million. About this amount, appellant testified at her deposition, "Wow! No, I don't know that." Where the product suitability form mentions "tax deferred growth," appellant did not know what it meant. She did not recall things being explained to her that were listed in the form, such as her having $40,000 in liquid

6

assets. She denied that Ige explained the documents to her and she thought she was getting another life insurance policy. Appellant apparently checked off life insurance in the application, but Ige did not explain the statement of understanding to appellant. Ige did not advise or tell appellant that if she withdrew money from the annuity she would incur a penalty. Appellant was just signing forms where she was told to do so; and she would leave the rest blank. She did not ask what she was signing because she trusted Ige and Jenkins. However, appellant admitted that she signed the application, product suitability form and the statement of understanding. Although she tried to read the policy after it was given to her she did not understand it. She was not pressured into purchasing the annuity but "swayed" by the scheme of making wealth and leaving money to her children. Appellant denied that Ige explained that she had the right to examine the policy and if she was not satisfied could cancel it within the "free-look" period. Appellant never questioned Ige about the policy because the plan was to put the money away until she was ready to use it. Because she was not ready to use it, she put the policy away.

The parties presented competing expert declarations as to whether the MasterDex 10 was a suitable investment for appellant. Respondent's evidence indicated that it was an acceptable investment for seniors because the annuity provides a steady stream of income to the policyholder or the beneficiary. If appellant died early, the annuity would provide tax free growth, then income for her beneficiaries. The MasterDex 10 annuity was an indexed annuity, which meant that absent policyholder withdrawals, it would increase in value but not go down. The MasterDex 10 did not contain any term or provision which required respondent to reinstate funds that are stolen. Appellant's expert,[2] Mary Rae Fouts, opined that it was not typically a good idea to refinance a property and put the money into an annuity. This was especially true for a senior person. In expert Clinton Miller's opinion, insurance companies entrusted with

_____

**2** Appellant filed two expert declarations in support of her opposition to summary judgment. As noted below, the trial court sustained respondent's objections to substantial portions of both expert declarations.

7

funds were required to not negligently or recklessly send payments to a third party without express authorization.

Appellant funded the annuity with an initial deposit of $125,000 and a subsequent deposit of $200,000. Appellant received an immediate bonus of $32,500 credited to the value of the annuity. Ige and respondent denied being informed of the source of the premiums. But, appellant maintained that Ige was at the meetings where the plans were discussed to refinance both the residential and investment properties and place the money into the annuity. Ige subsequently met with appellant and delivered copies of the annuity policy. Ige told appellant to call him if she had any questions about the policy but appellant admitted she never called Ige to question the policy. According to appellant, this was because the plan was to put the money away until she was ready to use it. She put the policy away because she was not ready to use the money. Aside from meeting with appellant to apply for long term care, Ige and appellant had no further contact.

In the spring of 2008, Jenkins called appellant about investing in property in San Bernardino. Appellant initially did not agree but then changed her mind after her son told her the investment "sounded like a good idea." According to appellant, she did what she was told because she trusted representations by Jenkins and Ige about taking money out of her properties. After speaking with Jenkins again, appellant met him in the parking lot of her credit union. Jenkins asked her to withdraw $20,000 to use as a down payment on investment property. Jenkins also asked her to withdraw some money from her annuity. Jenkins told her that if the $20,000 from the credit union was insufficient, he did not want to miss out on the opportunity; so Jenkins asked appellant to take $20,000 from the annuity.

Appellant did not dispute that Ige was not a participant or mentioned at all during any of the spring 2008 calls regarding the San Bernardino real estate investment. Ige was not present or mentioned during the meeting at appellant's credit union parking lot. On June 10, 2008, appellant called respondent to inquire about making a withdrawal from her annuity. Appellant was informed that she could withdraw up to $32,500 without penalty from the annuity. Appellant asked for a request form to be sent to her home. A

8

few days later, appellant met Jenkins alone in the parking lot of her credit union and withdrew $20,000 in cash for him. Jenkins then presented her with a blank request form for respondent. Jenkins told appellant he would only withdraw money from the annuity if he needed it for the San Bernardino investment property. Jenkins told her to just sign her name on the request form and that he would take care of the rest. Jenkins told her to trust him so she did. Appellant trusted Jenkins because he was able to help her refinance the investment property after she had been denied on a different occasion. Appellant did not read the request form but skimmed through it. She printed her name on the first page and then signed and dated the second page. She gave the request form back to Jenkins.

Respondent received the request form and verified appellant's signature. On July 10, 2008, respondent sent a letter to appellant regarding the partial surrender of the annuity. The letter confirmed the details of the transaction including the check amount of $220,000 payable to Connexx Financial Services for the benefit of appellant. Appellant does not recall or remember seeing this letter or a second letter dated July 10, 2008 from respondent. The second letter confirmed that the partial surrender was a taxable event because it was not set up as a trustee transfer. On July 11, 2008, respondent issued a check to Connexx for appellant's benefit. Jenkins endorsed the check at a Wells Fargo bank branch. The check cleared on July 17, 2008.

Appellant did not have any contact with Jenkins until two months after meeting him in the credit union parking lot. Jenkins telephoned her and asked to come to her home. Jenkins brought her a check for $20,000 which represented the money she gave him from the credit union. Jenkins admitted to appellant that he "messed up" with her money, but he did not explain his statement. The meeting lasted only about ten minutes and then Jenkins abruptly left. Appellant never saw or spoke to Jenkins again.

Appellant claimed she did not remember receiving the July 10, 2008 letter confirming the partial surrender. However, she also claimed that, after receiving the letter or a similar one, she called respondent. She did not recall the date she called respondent and asked that a hold be placed on the check. According to respondent's records, appellant did not make any calls to respondent to request stop payment of the

9

check until February 2009. Respondent cited appellant's home telephone bills which showed no calls were made to respondent between June 1, 2008 and September 1, 2008. Appellant asserted the calls might have been made on her cellular telephone or on Aaron's telephone.

Appellant retained counsel who sent a letter on August 24, 2009, demanding reinstatement of the annuity funds. According to respondent, the demand was denied after a thorough investigation. Appellant disputed whether the investigation was thorough because it was not conducted until July 2009.

Ige denied having any affiliation with Connexx and that there was evidence he conspired or schemed with Jenkins to commit fraud. Ige also denied that he ever advised appellant to invest in real estate in San Bernardino. Ige was not involved with the request to surrender form and did not know that Jenkins called appellant in the spring of 2008. Ige was not aware that Jenkins asked appellant to withdraw money from her credit union account and the annuity. Ige had no knowledge of the meeting between appellant and Jenkins in the credit union parking lot where appellant signed the request form. Ige was not aware that Jenkins had withdrawn $200,000 more than appellant authorized him to do. Ige did not know of the submitted request until he received a copy of respondent's July 10, 2008 letter confirming the withdrawal. Ige then called respondent to inquire about the details of the withdrawal request in case appellant called him with questions.

Ige did not hear from appellant until July 2009 when Aaron called and informed him that appellant never received the money she withdrew. Aaron remembered attempting to contact Ige a few days after he received a facsimile from respondent with the cancelled check. According to Aaron, he asked if Ige knew Jenkins had taken money from appellant's account. Ige replied, "no." Ige also said, "I hope Jenkins didn't do anything stupid." Ige provided Aaron with the last known address and contact information for Jenkins. Ige's last contact with Jenkins was in the middle of 2008 when Jenkins called about an interest in a life insurance policy for himself. Jenkins did not follow up on the request.

In opposition to the summary judgment, appellant maintained that Ige was told from the beginning that appellant wanted to leave her properties free and clear to her children. Appellant declared that in late 2006 or early 2007, she was trying to refinance the investment property to help pay some bills and remodel her kitchen. She only wanted as much cash as she needed for her intended goals. She refinanced the investment property in March 2007 and received $290,000 in cash proceeds after meeting with Jenkins. Appellant met Ige "a few weeks later" when Jenkins and Ige went to her residence with a few other people. Jenkins represented that the people were his financial team and that Ige was his partner and worked at his office. Appellant declared that "defendants" advised her to take the proceeds from the first refinance to place them into investment life insurance for her children and grandchildren. They also told her to refinance her residence. Appellant was presented with a plan to take the money from the refinances and place it into an insurance product to grow interest and later to be used to buy more properties when the real estate market was right. Appellant refinanced her residence in May 2007. At Ige's direction, she gave him $125,000 in March 2007 and $200,000 in May 2007 for the investments. Appellant declared: "Sometime after signing the [request for surrender] document, I recall receiving a letter from [respondent] advising me that $220,000 was withdrawn from my policy and a check was issue[d] to Connexx Financial Services." At some unspecified point, appellant called respondent to say the check was not authorized.

Ige was told that appellant was going to refinance her properties and place money into investments with Ige where the interest would grow. Once the real estate market went down, appellant would invest in real estate in San Bernardino by taking money out of the annuity. Although Ige did not describe the annuity, he prepared the application for appellant.

In her separate statement of undisputed facts, appellant maintained that she took "defendants' advice" about refinancing the properties. Respondent contended, however, that the claim was contradicted by appellant's deposition testimony that Jenkins alone advised her to refinance the property to purchase other property.

11

Appellant also produced two expert declarations in opposition to the summary judgment motion. However, the trial court sustained objections to substantial portions of the expert declarations as speculative, lacking in foundation and improper opinion. Mary Rae Fouts, a licensed life and disability insurance analyst, declared that the MasterDex 10 annuity required a 15-year period before the owner could obtain the full value of the contract: five years of deferred contract accumulation plus ten years of annuitization. She opined that because the funds were not liquid it was not suitable for a senior citizen such as appellant who needed liquid funds for living expenses. The trial court also sustained objections to Fouts's opinion that respondent failed to comply with insurance standards in the handling of the $220,000 withdrawal.

The trial court also sustained objections to substantial portions of appellant's expert declaration by Clinton E. Miller, an attorney and insurance consultant. In Miller's opinion, respondent breached the standard of care and the Elder Abuse Act by processing the request to surrender the funds without personally contacting appellant to make sure she had, "in fact," authorized the withdrawal. He cited evidence: appellant claimed the $220,000 withdrawal was not authorized; appellant's age; there were discrepancies in the ink on the request; there was a quick turnaround from the deposit until the withdrawal of the large sum of money; there were large surrender charges; the check was made payable to an unknown party; and respondent delayed investigating appellant's claim from February 2009 until July 2009. The trial court sustained objections to this evidence on the ground the opinion was speculative, improper opinion and conclusory. The trial court also noted that Miller had failed to consider the evidence in this case which showed that prior to dispensing the check respondent notified appellant by letter of the amount of the withdrawal.

At the oral argument, the trial court allowed appellant to file additional evidence outlining specific portions of her deposition testimony, which supported her claim that triable issues of material fact existed. Thereafter, the trial court granted summary judgment in respondent's favor. Appellant filed this timely appeal from the judgment.

12

## DISCUSSION

### I.    Standard of Review

A defendant is entitled to a summary judgment "only if 'all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' [Citation.]" (*Martinez v. Combs* (2010) 49 Cal.4th 35, 68.) "[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law.  That is because of the general principle that a party who seeks a court's action in his favor bears the burden of persuasion thereon.  [Citation.]  There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. . . .  [¶] . . . [T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact . . . .  A prima facie showing is one that is sufficient to support the position of the party in question.  [Citation.]" (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 850–851, fns. omitted.)  In addition, a summary judgment motion is directed to the issues framed by the pleadings.  (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1252; *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673, overruled on a different point in *Reid v. Google, Inc*. (2010) 50 Cal.4th 512, 527.)  We independently review the record to determine whether triable issues of material fact exist.  (*Elks Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593, 606.)  We review the evidence in a light most favorable to the losing party resolving ambiguities and evidentiary disputes in the losing party's favor. (*Martinez v. Combs*, *supra*, at p. 68.)

13

## II.    Triable Issues of Material Fact on the Elder Abuse Claim.

Welfare and Institutions Code section 15610.30 prohibits financial abuse of an elder.  At the time the annuity was created in 2007, former Welfare and Institutions Code section 15610.30 provided:  "(a) 'Financial abuse' of an elder or dependent adult occurs when a person or entity does any of the following:  [¶]  (1) Takes, secretes, appropriates, or retains real or personal property of an elder or dependent adult to a wrongful use or with intent to defraud, or both.  [¶]  (2) Assists in taking, secreting, appropriating, or retaining real or personal property of an elder or dependent adult to a wrongful use or with intent to defraud, or both.  [¶]  (b) A person or entity shall be deemed to have taken, secreted, appropriated, or retained property for a wrongful use if, among other things, the person or entity takes, secretes, appropriates or retains possession of property in bad faith.  [¶]  (1) A person or entity shall be deemed to have acted in bad faith if the person or entity knew or should have known that the elder or dependent adult had the right to have the property transferred or made readily available to the elder or dependent adult or to his or her representative.  [¶]  (2) For purposes of this section, a person or entity should have known of a right specified in paragraph (1) if, on the basis of the information received by the person or entity or the person or entity's authorized third party, or both, it is obvious to a reasonable person that the elder or dependent adult has a right specified in paragraph (1)."  (Stats. 2000, ch. 442, § 5.)  A party, who commits financial abuse of an elder, is liable for additional and enhanced remedies including attorney fees and costs as set forth in Welfare and Institutions Code section 15657.5, subdivision (a).  (*Delaney v. Baker* (1999) 20 Cal.4th 23, 33; *Berkley v. Dowds* (2007) 152 Cal.App.4th 518, 529.)

Appellant claims respondent committed financial abuse in violation of the elder abuse statutes:  (1) by refusing to restore the $220,000 which Jenkins withdrew; and (2) by selling her an annuity which was unsuitable for her needs.

Respondent is correct that its refusal to restore $220,000 wrongfully withdrawn from the annuity by Jenkins is not financial elder abuse.  In order to prevail on the cause of action for elder abuse, appellant is required to prove causation.  (*Das v. Bank of America, N.A.* (2010) 186 Cal.App.4th 727, 744.)  Appellant produced no evidence that

14

respondent's conduct caused the $220,000 loss. Rather, appellant's theorizes that Ige conspired with or aided and abetted Jenkins in financial abuse against appellant by creating the annuity in order to defraud appellant in a real estate scam. But, there was no evidence that anyone other than Jenkins was responsible for altering the request for surrender and defrauding appellant of $220,000 from the annuity. Appellant claims respondent is liable based on *allegations* Ige conspired with or aided and abetted Jenkins in defrauding appellant of money with a bogus real estate investment scam.

"'The elements of an action for civil conspiracy are the formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design." (*Doctors' Co. v. Superior Court* (1989) 49 Cal.3d 39, 44.) There was no evidence that there was a formation and operation of a conspiracy between Jenkins and Ige which resulted in damage to appellant from acts done in furtherance of a common design. The only evidence presented in the trial court was that Jenkins brought Ige to appellant's home in 2007. During this meeting, the parties may or may not have raised the issue of appellant refinancing her home to purchase an annuity. There may or may not have been a discussion about some potential unspecified future real estate investments. However, there was no evidence that Ige made any representations to appellant about any specific property, including the San Bernardino property. More importantly, the undisputed facts established that when the money was taken from appellant in 2008 Jenkins was acting alone. It was Jenkins who called appellant about the San Bernardino property investment. There is no evidence Ige called appellant about the San Bernardino investment or even knew that Jenkins and appellant discussed the investment. Ige denied being aware of the details of the withdrawal or the San Bernardino investment. Ige was not present when appellant and Jenkins met in a car at her credit union in 2008. Thus, Ige was not present when appellant signed the request to surrender the annuity funds. Appellant produced no evidence that Ige was aware of the purported investment or that Jenkins had allegedly altered the amount of the request form. Thus, there was no evidence to support a conspiracy theory.

15

Furthermore, appellant produced no evidence to support the theory that Ige aided and abetted Jenkins in defrauding her of annuity funds. Liability for aiding and abetting requires that a defendant knowingly and substantially assist a third party to perform a wrongful act. (*Casey v. U.S. Bank Nat. Assn.* (2005) 127 Cal.App.4th 1138, 1146; *Howard v. Superior Court* (1992) 2 Cal.App.4th 745, 748–749.) "'[A]iding and abetting . . . necessarily requires a defendant to reach *a conscious decision to participate in tortious activity* for the purpose of assisting another in performing a wrongful act.'" (*Casey v. U.S. Bank Nat. Assn., supra*, at p. 1146 quoting *Howard v. Superior Court, supra*, at p. 749.) There was no evidence that Ige made a conscious decision to participate in Jenkins' tortious acts of altering a request form in order to improperly obtain $220,000 from the annuity.

However, appellant also claims that Ige sold her an annuity knowing that appellant would probably never benefit from it given her age and income. She argues the evidence established the following circumstances. The annuity was sold to her so that Ige could obtain a huge commission and to aid Jenkins in the real estate scam. The evidence shows that Ige knew: she refinanced her property to fund the annuity; and she intended to withdraw money from the annuity if an opportunity for a good real estate investment materialized. She also claims respondent failed to disclose the full economic consequences of the annuity before selling it to her.

Respondent counters there was no elder abuse because appellant testified that her primary goal in creating the annuity was to leave something for her grandchildren. There was evidence that the annuity would create an income for appellant's heirs. In addition, appellant testified that she did not recall what Ige explained to her. Appellant admitted that she signed the application, the product suitability form, and the statement of understanding.

The record shows that there is a dispute about what was said during the March 2007 meeting between Ige, Jenkins and appellant about the purpose of the annuity. Respondent asserted that the purpose of the annuity was to generate income on a long-term investment. Appellant stated she wanted to withdraw funds from the annuity on a

16

short-term basis if a real estate investment opportunity arose. The evidence was conflicting as to whether Ige was aware of appellant's desire to remove money from the annuity for a real estate investment. The evidence was also conflicting as to whether the annuity was unsuitable for appellant given her age and income.[3] Thus, respondent failed to establish it was entitled to summary judgment on appellant's theory that selling the annuity to her was financial abuse within the meaning of the elder abuse statute.[4]

---

[3]    The parties disagree about the effect of the evidentiary rules striking substantial portions of appellant's expert declarations, including the Fouts declaration. Respondent claims that the rulings are not challenged on appeal so the rulings must remain intact. Appellant's opening brief does challenge the rulings but not specifically as to each ruling. We have reviewed the rulings and the Fouts declaration which was not stricken in its entirety. The Fouts declaration coupled with appellant's own declaration provide sufficient evidence that the annuity may not have been appropriate for appellant.

[4]    Because summary judgment was not appropriate on the elder abuse claim, we need not address the other causes of action raised by the parties.

## DISPOSITION

The summary judgment is reversed and remanded in its entirety as to Allianz Life Insurance Company of North America and Leonard Ige.  Appellant is awarded costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J. *
          FERNS

We concur:



_____, P. J.
          BOREN


_____, J.
          CHAVEZ

_____

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18